van Gestel, J.
Each defendant, Vantage Travel Services, Inc.[1] (“Vantage”) and Outlook Label Systems, Inc. (“Outlook”), has moved for summary judgment on all counts against each corporation. The plaintiff, Boston Business Forms, Inc. (“BBF”), opposes both motions. For the following reasons both motions are ALLOWED as to all counts and the complaint is to be dismissed.
BACKGROUND
BBF alleges contractual relationships with both Vantage and Outlook. Whether such relationships ever came into being will be a major factor in resolving the pending motions. No written agreements exist with regard to BBF’s relationship with either defendant. Thus, the Court must first determine whether disputed material facts stand in the way of determining BBF’s relationship with either or both. The facts that follow are not challenged by BBF.
BBF is a newly formed Massachusetts corporation, intent upon doing business as a distributor in the business forms industry. Prior to forming BBF, its two founders, Timothy McCarthy and Timothy Curtin, were social acquaintances of Mary Lou Newman, director of printing and purchasing as well as a production manager, at Vantage.
Vantage is a Massachusetts-based entity whose principal business consists of direct mail, product-induced fund raising. In connection with its business, Vantage purchases a wide variety of business forms and products, including envelopes, cards and labels. Most of these purchases are made directly from manufacturers; the remaining are from distributors, who first purchase the product from manufacturers and then resell it to Vantage for a commission or markup in price.
Outlook is a Wisconsin company that manufactures business labels. Outlook sells its labels both to distributors and end-users. Prior to the incident in issue here, Outlook never had any business relationship with either BBF or Vantage.
Shortly after BBF began operations, Curtin of BBF started contacting Newman at Vantage seeking business for the new venture. He met with very limited success. Vantage placed only a few small purchase orders for business forms with BBF. In addition to the few orders placed by Vantage, BBF submitted price quotations for several other potential business forms orders that did not result in purchases.
In the fall of 1993, Curtin learned from Newman of Vantage’s constant need for large quantities of labels in its direct-mail marketing campaigns. At this time BBF had yet to sell or distribute any label orders of the magnitude required by Vantage. Supposedly, and accepted for purposes of these motions, Newman said to Curtin: “Labels is where the money is. If you want to make some money, this is where you want to go.” When BBF and Vantage were discussing the label business, Newman is said to have shown BBF a chart setting forth the specifications and deadlines of all Vantage’s upcoming label orders, discussed the quality of the work she was looking for, discussed Vantage’s customers’ needs, shared Vantage’s current price list with BBF, and suggested that she would purchase labels from BBF if it could find acceptable product at competitive prices.
BBF thereafter began searching for label manufacturers that would meet Vantage’s needs. In early 1994, BBF submitted price quotations to Vantage in connection with a potential order of business labels. These quotations came from several label manufacturers, including Outlook. Vantage insisted that prior to entering into any agreement to purchase, it first would have to inspect the manufacturer’s facilities. These inspections were routine for Newman in deciding whether to purchase goods for Vantage from a particular company.
BBF made arrangements to visit Outlook in Wisconsin in late March 1994. Newman traveled with Curtin for the visit. At the time of the trip, Vantage had made no decision to purchase labels from either BBF or Outlook. Even if Newman had been satisfied with the Outlook facility, before discussing the placement of any orders she intended to have the manufacturer do a test run of the labels.
When McCarthy of BBF first contacted Outlook, he was aware that Outlook sold its labels through distrib *505 utors as well as directly to end-users. During these preliminary discussions, Outlook never represented to anyone on behalf of BBF that BBF would serve as Outlook’s distributor for any labels purchased by Vantage. Similarly, Outlook never told BBF that it would not sell labels directly to Vantage.
Both Outlook and BBF were, at all material times, members of the National Business Forms Association (“NBFA”), Outlook as a “manufacturer” member and BBF as a “distributor” member. Vantage was not a member of NBFA. The organization has published rules for members with regard to their business practices with each other. Basically, those rules are designed to have manufacturers and distributors work together cooperatively for the benefit of the customer and, thereby, the industry as a whole.
Again for purposes of these motions only, the Court accepts BBF’s contentions that Outlook, at the time leading up to and at the visit by Vantage to the Wisconsin facility, acknowledged that BBF was a distributor and that Vantage was BBF’s customer. Indeed, both Outlook and Vantage treated BBF as if it were a distributor at the time of the Wisconsin visit.
Newman was impressed with Outlook’s label manufacturing operations and wanted to do business. Unbeknownst to her, however, Outlook, consistent with its normal practice, had requested a credit report on BBF. The report indicated that the credit agency had not received a sufficient sample of BBF’s payment experience to establish a credit rating for it. This caused concern by Outlook that BBF might not have sufficient operating capital to serve as a distributor for any large label orders. Given that no orders were then pending, Outlook decided to await the results of the visit, and a firm interest by Vantage in purchasing labels from Outlook, before requesting additional financial information from BBF.
Following the visit, and after Vantage had expressed a firm interest in buying labels from Outlook, Outlook made further inquiiy as to BBF’s ability to serve as a distributor in the kind of business contemplated. BBF would have to have the ability to finance the purchase of labels from Outlook, before reselling them to Vantage.'At the time, BBF had less than $5,000 in its bank account. BBF suggests that it also had access to “personal and family monies," presumably from McCarthy and Curtin, that could have been used. In addition, McCarthy proposed to Outlook that BBF would make a 50% pre-payment to secure any deal. It is further contended by BBF that Outlook agreed to proceed on those terms. Again, the Court accepts these facts only for purposes of deciding these motions.
On April 13, 1994, Outlook wrote to Vantage, reporting that its “business relationship with Boston Business Forms ended [that day]” and noting that “financial details could not be worked out and the partnership dissolved.” In the same letter, Outlook expressed interest in working with Vantage directly and asked: “Will you consider us as a vendor for your printing needs?” There is no allegation by BBF that Vantage solicited this letter or was aware of the financial arrangements, or their breakdown, between BBF and Outlook.
At no time did Vantage ever submit an order to BBF for the purchase of Outlook manufactured labels. Nor did Vantage and BBF ever come to terms on the key details of any purchases by Vantage from BBF of Outlook products.
Following receipt of the April 13, 1994 letter, Vantage and Outlook began a profitable direct business relationship wherein Outlook manufactured and sold to Vantage millions of dollars worth of business labels. It is these sales in which BBF claims that it should share as the exclusive distributor, on some unstated commission or price markup basis.
DISCUSSION
This Court will grant summary judgment where there are no genuine issues of material fact and where the record entitles the moving parties to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving parties bear the burden of affirmatively showing the absence of triable issues, and that the summary judgment record entitles them to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Parties seeking summary judgment who do not bear the burden of proof at trial demonstrate the absence of triable issues by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party is unlikely to submit proof of that element at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The nonmoving parly’s failure to prove an essential element of its case “renders all other facts immaterial” and mandates summary judgment in favor of the moving parties. Id.
A dominant issue in this case is whether BBF has shown that it had a contract with either defendant. In assessing this issue, it seems useful first to consider just what it is that BBF purports to be. It describes itself as a company that distributes printing products and business forms. It says that Outlook agreed to treat it as a distributor, and that Vantage was its customer. It points to its affiliation in NBFA as a Distributor Member. Thus, this Court cannot be faulted for assuming and finding there to be no dispute on the issue that BBF is a distributor of business forms.
The generally understood definition of a distributor is that of an entity that purchases products from a manufacturer and resells those products to end-users. This is just the kind of relationship that BBF *506 claims it had with Overlook — it would buy Overlook’s products and resell them for a commission from the manufacturer or at a markup from the manufacturer’s price. “BBF would never discuss its profit margin with a customer . . . The distributor’s markup on the manufacturer’s price is considered confidential information that is never shared with the customer.” (Plaintiffs Memorandum in Opposition to Defendant Outlook’s Motion for Summary Judgment, at page 10, citing as support the Deposition of T. McCarthy, at page 127.)
Claims against Outlook
The contractual relationship that BBF claims with Outlook is that between a distributor and a manufacturer. BBF and Outlook, of course, never did any business with each other before the visit to Wisconsin in March 1994. Indeed, the two companies never knew each other existed until shortly before that occasion. The visit was not in furtherance of any activity by BBF as Outlook’s distributor, but rather to enable Vantage to appraise the quality of Outlook’s manufacturing facility before deciding whether to buy Outlook’s label products.
There never was any written distributorship agreement between BBF and Outlook, and Vantage never submitted any orders to BBF for the purchase of Outlook labels. What, then, is the evidence of an oral distributorship agreement? BBF needs to show more than desire for the position. At minimum a bare outline of terms and conditions needs to have been discussed and agreed upon. It was not. For example, freight and shipping costs were never discussed, delivery times for specific label orders were not addressed, terms for commission payments by Outlook to BBF were not even broached, and the key issues of financing purchases by BBF from Outlook and BBF’s own financial status were never satisfactorily resolved. Indeed, it was on the latter issue of BBF’s financial capability — or lack thereof — that the relationship between Outlook and BBF foundered. For an oral contract to be enforceable, the material conditions of the contract must be sufficiently definite that the nature and extent of the obligations of the parties may be ascertained. Simons v. American Dry Ginger Ale Co., 335 Mass. 521 (1957).
Even should it be thought that there was sufficient accord on the key elements of a distributorship agreement between BBF and Outlook, the Statute of Frauds looms here as a bar to such an agreement. Certainly what was contemplated was the sale of goods for the price of $500 or more. This was the essence of the distributorship contemplated. There was little servicing to be performed by BBF and no installation or the like. Contrast Cumberland Farms, Inc. v. Drehmann Paving & Flooring Co., 25 Mass.App.Ct. 530, 534 (1988). The Statute of Frauds provisions of the Uniform Commercial Code, G.L.c. 106, Sec. 2-201(1), would bar the enforcement of the particular agreement suggested.
No distributorship contract between BBF and Outlook even came into existence. See, e.g., Mass Cash Register, Inc. v. Comtrex Systems Corp., 901 F.Sup. 404, 415 (D. Mass. 1995). Count I should, therefore, be dismissed.
Count II is the ubiquitous c. 93A claim. BBF charges that the direct sale of labels by Outlook to Vantage, after the Wisconsin visit in 1994, was an unfair and deceptive act. The reasoning by the Court in Mass Cash Register, Inc., supra, 901 F.Sup. at 425, applies well here: “Every deal that goes sour does not give rise to a c. 93A claim." Pappas Industrial Park, Inc. v. Psarros, 24 Mass.App.Ct. 596, 600 (1987). There is no c. 93A claim here, so Count II must be dismissed.
Count III asserts a charge that Outlook breached the implied covenant of good faith and fair dealing. This count crumbles on the earlier determination that there never was a contract between BBF and Outlook. There being no contract, there can be no implied covenant in connection therewith. Count III, therefore, must be dismissed.
In Count IV, BBF charges Outlook with interfering with BBF’s contractual relationship with Vantage. Since this Court finds that no contractual relationship existed between BBF and Vantage, see infra at pp. 12-13, Outlook cannot have committed the tort. See, e. g., Draghetti v. Chmielewski, 416 Mass. 808, 816 (1994). Count IV cannot stand.
Count V is similar to Count IV, charging Outlook with tortious interference with BBF’s prospective contractual relationship with Vantage. To succeed on this count, BBF must show that Outlook intentionally and improperly interfered with a business relationship or contemplated contract of economic benefit with Vantage and that BBF’s loss of advantage was a direct result of Outlook’s conduct. Mass Cash Register, Inc., supra, 901 F.Sup. at 421. But there is nothing in the summary judgment record that shows that Outlook made any representations to BBF or otherwise engaged in any other improper conduct in connection with its negotiations. Perhaps more significantly, there is nothing to show that Outlook induced Vantage to break any claimed agreement with BBF. Outlook terminated its discussions with BBF because of concerns over BBF’s insufficient operating capital. That Vantage thereafter chose to buy direct from Outlook does not provide proof of the tort here charged. CountV cannot survive on the record before the Court.
In Count VI, BBF alleges fraud and deceit. It somehow suggests that Outlook induced BBF to introduce Vantage to Outlook, knowing that it had no intention of forming a distributorship relationship with BBF. The facts to support this claim are absent from the record. There must be “a false representation of a material fact, with knowledge of its falsity, for the purpose of inducing the plaintiff to act thereon, and *507 that the plaintiff relied upon the representation as true and acted upon it to [its] damage.” Graphic Arts Finishers, Inc. v. BRA, 357 Mass. 40, 44 (1970).
No representations are shown to the effect that Outlook would permit BBF to act as its exclusive distributor for all label orders placed by Vantage. Outlook didn’t initiate the visit by Vantage to Wisconsin or otherwise solicit Vantage’s business until after the relationship with BBF broke down. In short, nothing is presented that would support Count VI. It should be dismissed.
Count VII makes claims in the nature of promissory estoppel. BBF claims that Outlook promised that BBF would serve in the role of distributor if, and when, Vantage purchased labels. Again, there must be an unambiguous promise, reasonably relied upon, that induces a course of conduct relied upon to the plaintiffs detriment. Mass Cash Register, Inc., supra, 901 F.Sup. at 420; Cellucci v. Sun Oil Co., 2 Mass.App.Ct. 722, 728 (1975). The record here is devoid of any necessary unambiguous promises by Outlook of an exclusive distributorship agreement. Nor is there evidence of BBF’s reliance on such a promise. BBF, at all times material here, was simply prospecting for business. Count VII cannot stand.
Count VIII seeks recovery in quantum, meruit. To prevail BBF must show that it conferred a measurable benefit on Outlook for which Outlook expected to pay for the services rendered, and that BBF furnished the services with a reasonable expectation of securing compensation from Outlook. Mass Cash Register, Inc., supra, 901 F.Sup. at 423.
A reasonable person in Outlook’s position would not have expected to pay anything to BBF because the distributorship agreement never materialized. Similarly, a reasonable person in BBF’s shoes would not expect to be paid by Outlook for the same reason. There is no basis to employ the equitable damages provisions of quantum meruit here. Count VIII should be dismissed as well.
Claims against Vantage
Vantage, as the potential customer of BBF, the distributor, has no “distributorship” contract with BBF. BBF “distributes” nothing for Vantage. Rather, Vantage, as a “customer,” only submits purchase orders to BBF to buy products distributed and sold by BBF. Thus, only when Vantage submits a purchase order to BBF does a contract between the two come into being. Here, the facts are undisputed. Vantage never submitted a written purchase order to BBF for any Outlook products; and BBF never had any Outlook products to sell.
A promise by Newman on behalf of Vantage to buy business labels from BBF if the price is competitive standing alone does not constitute a binding contract. The absence of material details and consideration makes this so obvious as to obviate the need for supporting citation.
An oral agreement by Vantage to purchase Outlook products from BBF — which is the only contract between BBF and Vantage accurately alluded to in BBF’s papers — would, of course, be a contract for the sale of goods. To the extent any such contract was for the price of $500 or more, it would not be enforceable in the absence of a writing. See Mass. G.L.c. 106, Sec. 2-201(1). BBF alleges that the purchases made to date by Vantage direct from Outlook exceed $6,000,000. In the absence of some evidence from BBF that any of those purchases were individually for less than $500, the Statute of Frauds is a bar.
This Court finds, on undisputed facts, that there was no contract between Vantage and BBF. Consequently, there can be no breach, and Count IX must be dismissed.
Count X is grounded on allegations that Vantage engaged in “unfair and deceptive acts and practices” prohibited by Mass. G.L.c. 93A. There is, however, no factual support for such a claim. As noted earlier, “[e]very deal that goes sour does not give rise to a c. 93A claim.” Pappas Industrial Park, Inc. v. Psarros, supra, 24 Mass.App.Ct. at 600. Nor does a mere charge of breach of contract, standing alone, state such a claim. Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 18 (1st Cir. 1985); Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 418 Mass. 737, 743 (1994). There is nothing more here. BBF proffers no material facts showing that Vantage willfully deceived it with promises that it intended from the outset to breach or that Vantage acted in disregard of known contractual obligations. There were no contractual obligations. Count X must also be dismissed.
Count XI charges Vantage with breach of the implied covenant of good faith and fair dealing. This Count fails for lack of any foundation. Such an implied covenant is part of a contract. Here, in the absence of a contract, there can be no implied covenant and no breach thereof. Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992). Count XI cannot stand. It must be dismissed.
Count XII seeks relief for alleged intentional interference with a claimed contract between BBF and Outlook. A contract between BBF and Outlook, of course, is a predicate to viability for this count. Draghetti v. Chmieleski, 416 Mass. 808, 816 (1994). But, as seen above at pages 8-9, there is no contract between BBF and Outlook and, consequently, no contract to interfere with. Count XII must be dismissed as well.
Count XIII charges Vantage with intentional interference with prospective contractual relations. The four elements that must be proved to prevail on such a claim are: the existence of a business relationship or a contemplated contract of economic benefit; *508 Vantage’s knowledge of such a relationship; Vantage’s intentional and improper interference with that relationship; and BBF’s loss of advantage as a direct result of Vantage’s conduct. United Track Leasing Corp. v. Geltman, 406 Mass. 811, 814-16 (1990). It is not enough to show just interference — and even that is lacking here; there must be some evidence that the interference is “wrongful by some measure.” Schinkel v. Maxi-Holding, Inc., 30 Mass.App.Ct. 41, 50-51 (1991). On this point alone, no facts are stated showing wrongfulness on Vantage’s part. The plaintiff must do more than make charges; it must put forth material facts which, if believed, will prove the point. Count XIII must be dismissed.
Count XTV is in tort for fraud and deceit. Here BBF must put forth facts showing that Vantage made a false representation of material fact, with knowledge of its falsity, for the purpose of inducing BBF to act, and that BBF acted thereon to its damage. Graphic Arts Finishers, Inc. v. BRA, 357 Mass. 40, 44 (1970). “(F]alse statements of opinion, of conditions to exist in the future, or matters promissory in nature are not actionable.” Yerid v. Mason, 341 Mass. 527, 530 (1960).
BBF’s principals both have conceded in their depositions that they had no reason to believe that Vantage planned, from the outset, to do business directly with Outlook. Nor is there anything to show that Vantage would not have purchased Outlook’s products from BBF if it had such products to sell and the price was right. There is no fraud here, and Count XTV must be dismissed.
Count XV speaks in the language of promissory estoppel. Three elements are required: a representation or conduct equivalent thereto intended to induce a course of conduct; an act or omission resulting from the representation by the person to whom the representation is made; and detriment as a consequence of the act or omission. Cellucci v. Sun Oil Co., 2 Mass.App.Ct. 722, 728 (1974). Here there is neither an unambiguous promise — Vantage reserved its rights, and BBF knew it, until at least after the visit to Outlook’s facility in Wisconsin- — nor reliance by BBF. Any efforts by BBF, after Vantage suggested an interest in doing business with it on business labels, were admittedly without any assurance or guaranty that Vantage would place an order. Count XV should be dismissed.
Count XVI asserts a claim for quantum meruit. Quantum meruit, of course, is not a cause of action, but rather a theory of recovery. See J.A. Sullivan v. Commonwealth, 397 Mass. 789, 793 (1986). To achieve a recovery under this theory, BBF must show that it conferred a measurable benefit on Vantage; that a reasonable person in Vantage’s position would expect to pay for the services accepted; and that BBF furnished the services with the expectation of being paid therefor. Bolen v. Paragon Plastics, Inc., 747 F.Sup. 103, 106-07 (D.Mass. 1990). Here, BBF was prospecting for business. It cannot say that it expected to be paid for “finding” Outlook or visiting it in Wisconsin. This was clearly part of the BBF mission to become Outlook’s distributor, not to perform a service for Vantage, the customer from whom it would closely guard the profit it was to make on the transaction. Count XVI cannot stand.
The last count against Vantage, Count XVII, asserts a claim for unjust enrichment. There is nothing in the papers before the Court to show that Vantage was enriched at BBF’s expense in its purchase of business labels directly from Outlook. Recall that Vantage, the customer, was never even to know the commissions Outlook would pay or markups that it was going to be charged by BBF. There are no factual allegations to support this count. CountXVII, like all the rest, should be dismissed.
ORDER
For the various reasons noted above, both motions for summary judgment are ALLOWED and judgment should enter dismissing the complaint in its entirety.

 The caption and pleadings speak of “Vantage Travel Services, Inc.” and yet the “Vantage" defendant in its motion and supporting memorandum speaks of “Vantage Group Services, a division of Vantage Financial Services, Inc.” No party seems to make anything of this fact and, therefore, the Court will use the description “Vantage" to refer to the Vantage defendant, whatever its correct corporate name may be.