THOMAS SCHINKEL *vs.* MAXI-HOLDING, INC., & another.[1]

No. 88-P-1294.

Essex. December 7, 1989. - January 30, 1991.

Present: ARMSTRONG, BROWN, & PERRETTA, JJ.

*Jurisdiction*, Nonresident. *Practice, Civil*, Service of process, Dismissal. *Contract*, Modification, Performance and breach, Employment, Sale of securities. *Evidence*, Extrinsic affecting writing. *Fraud. Consumer Protection Act*, Employment, Securities transactions. *Unlawful Interference*.

In a civil action, jurisdiction over the individual defendant, a foreign resident voluntarily present in the Commonwealth, was secured by service of process on him in Boston. [45-46]

It was error to dismiss a buyer's claim sounding in breach of a contract for the purchase and sale of stock where, although the buyer had not complied with the payment requirements of the written contract, it was open to him to show that the parties, by their conduct after signing the written contract, had, in effect, ratified a prior oral agreement modifying the terms of payment. [46-47]

Allegations in a complaint were sufficient to state a claim of fraud based on a false statement of a defendant's present intention to do a future act, as well as on a false statement of intent to refrain from invoking one of the terms of a contract, where the plaintiff's allegations sufficiently indicated the statements made, the period in which they were made, their falsity and the defendant's knowledge of their falsity, and the plaintiff's detrimental reliance thereon. [47-48]

In circumstances where a claim under G. L. c. 93A, the Consumer Protection Act, was arguably precluded as having arisen either out of an employment relationship or out of a transaction in securities, the question of the applicability of the Act was to be resolved on the record after trial, rather than on the defendant's motion to dismiss. [48-50]

A claim for tortious interference with a contract was properly dismissed for failure to state a claim on which relief could be granted, where the plaintiff's verified complaint, considered together with the unrebutted portions of the affidavits and counter-affidavits filed by the parties, alleged no wrongful conduct other than breach of the contract itself and fraud in its formation. [50-52]

_____

[1]Klaus Cederberg.

CIVIL ACTION commenced in the Superior Court Department on October 6, 1987.

The case was heard by *Peter F. Brady*, J., on a motion to dismiss.

*David Berman* for the plaintiff.

*Edward Woll, Jr.*, for the defendants.

ARMSTRONG, J. Maxi-Holding, Inc. (Maxi), the amended complaint alleges,[2] is a holding company organized in Massachusetts to hold shares of Eastern Lumber, Inc., and other corporations that are engaged in lumber and hardware businesses. The capital stock of Maxi is owned by Rake Oy, a Finnish corporation, which is controlled by the defendant Cederberg, who lives in Finland. Cederberg either is or acts as the chief executive officer of Maxi. The plaintiff, a Massachusetts resident, had done work as a consultant for Rake Oy and Maxi from the 1970's and in 1985 was asked by Cederberg to devote the majority of his time as a consultant to managing the affairs of Maxi and its subsidiaries. The parties entered into a contract, or, more technically, a pair of contracts, the first allowing the plaintiff to purchase shares of Maxi (the signatories were Maxi, Rake Oy, and the plaintiff), the other a management services contract between Maxi and the plaintiff (Cederberg signing for Maxi). The plaintiff rendered management services in 1986 but did not purchase shares.

In 1987 the parties entered into a similar pair of contracts. Cederberg signed for Maxi and, presumably, Rake Oy (Cederberg signed once, but both corporate names were typed in) in Helsinki on January 28, 1987. The plaintiff signed in Massachusetts on March 3, 1987. The management services contract was to run for two years with automatic renewals. The share purchase contract contained undertakings by Maxi and Rake Oy to issue class B, preferred, nonvoting shares of Maxi, representing ten percent of the Maxi capital

---

[2]The complaint was amended once as of right. See Mass.R.Civ.P. 15(a), 365 Mass. 761 (1974). The plaintiff filed a motion to amend the complaint a second time, but the judge ordered the complaint dismissed without acting on the motion.

stock, to be sold to the plaintiff for $70,000, half payable when the plaintiff signed, the other half payable forty-five days later. Another clause gave the plaintiff the right to purchase an additional ten percent in the same form (i.e., class B, non-voting, preferred) from six months into the contract until it expired. The price was to be based on appraisal by counsel agreeable to both parties.

The amended complaint alleges that before the agreements were signed the parties discussed and agreed that, because the plaintiff's compensation under the 1986 management services contract would not be known until later in 1987, and because the plaintiff would almost certainly be owed money by Maxi, he could defer payment for the initial issuance of class B shares until the compensation owed for 1986 should be known and then pay the difference between $70,000 and the compensation owed. In accord with this understanding, the plaintiff received, before signing, a communication from one Saraheimo, Rake Oy's director of business development and corporate lawyer, stating that it was not necessary that the plaintiff make the fifty percent up-front payment for the shares "right away," as the payment term was "flexible."

The compensation owed for 1986 became known in July, 1987, the plaintiff alleges, first in rough estimate ($50,000), later precisely ($55,000). When the estimate was known, the plaintiff tendered to Maxi a check for an additional $20,000, which Maxi accepted. When the precise compensation was known, Maxi refunded to the plaintiff $5,000. Despite receiving payment, the defendants have declined to issue the class B shares, have told the plaintiff they intend not to do so, and are planning to sell all the assets of Maxi to one Berg, a Finnish national, in the near future. The result of the proposed sale is that the shares of Maxi have taken on an enhanced value.

Based on these allegations, the plaintiff set up four claims for relief. Count one sought a declaration of the rights of the parties under the 1987 share-purchase contract and an order for specific performance, i.e., for the issuance of the shares to the plaintiff. Count two alleged fraud by Cederberg, in that

he had no intention of issuing the class B shares when he signed the agreement promising to do so, and sought injunctive relief (against sales of Maxi assets) and damages. Count three sounded in G. L. c. 93A: the intentional misrepresentation and the breach of contract being unfair and deceptive trade practices entitling the plaintiff to treble damages. Count four stated a claim for damages and injunctive relief for intentional interference, by Cederberg, presumably, with the plaintiff's contract with Maxi.

Maxi filed a motion to dismiss counts one, two, and three (the fourth count sought relief against Cederberg only) under Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974), for failure to state a claim on which relief could be granted. Cederberg filed a similar motion as to all four counts and, in addition, moved to dismiss the action against him personally for want of jurisdiction over his person and for want of proper service of process. The judge allowed Maxi's motion to dismiss each of the first three counts, with a cryptic statement of reasons. On Cederberg's motion the judge cross-referenced his action on the Maxi motion to dismiss, and he added, as to count four, "dismissed," without indicating whether that action was based on the failure of the count to state a claim for relief, or on lack of personal jurisdiction, or on improper service.[3]

The defendants have not filed answers to the amended complaint, the allegations of which were verified. Cederberg and Saraheimo both furnished affidavits, and the plaintiff provided counter-affidavits, the assertions of which will be mentioned where relevant.

---

[3]It is unnecessary to detail the procedural confusion which developed when (1) the judge dismissed the complaint, as amended once by right, without acting on a second motion to amend; and (2) the clerk entered a pair of judgments that seemed to dispose of counts one, two, and three as to Maxi and count four as to Cederberg. It was eventually resolved that the judge had intended to dismiss all counts against both defendants but to give the plaintiff thirty days to amend. The plaintiff felt that further amendments would not alter the substance of the complaint and elected to rely instead on his appellate rights which were timely claimed.

1. *Jurisdiction over Cederberg.* Cederberg, according to his affidavit, was served in hand at the Lafayette Hotel in Boston, the day after he and his wife had arrived in the United States for a pleasure trip. His jurisdictional contention is that his out-of-State actions as a nonresident officer and director of Maxi do not subject him to personal jurisdiction as an individual under the Massachusetts long-arm statute, G. L. c. 223A. He relies on the so-called "fiduciary shield" doctrine, discussed in such cases as *Marine Midland Bank, N.A.* v. *Miller*, 664 F.2d 899, 902 (2d Cir. 1981), *Columbia Briargate Co.* v. *First Natl. Bank in Dallas*, 713 F.2d 1052, 1055-1056 (4th Cir. 1983), and *Johnson Creative Arts, Inc.* v. *Wool Masters, Inc.*, 573 F. Supp. 1105, 1111 (D.Mass. 1983), aff'd, 743 F.2d 947 (1st Cir 1984).

The argument is beside the point. The long-arm statute extends the jurisdictional reach of Massachusetts courts to nonresidents who satisfy certain "minimum contact" connections with Massachusetts, as defined in G. L. c. 223A, § 3(*a*)-(*h*), as amended through St. 1987, c. 100, and who are served with process out of State in accordance with the procedures of §§ 6-8. There is no need to predicate jurisdiction over Cederberg on the long-arm statute. Jurisdiction over his person was conferred by service of process in Boston. There is no question that a nonresident served in person in Massachusetts is subject to the jurisdiction of our courts. *Barrell* v. *Benjamin*, 15 Mass. 354, 356-357 (1819). *Peabody* v. *Hamilton*, 106 Mass. 217, 220-221 (1870). *Klavan* v. *Klavan*, 405 Mass. 1105, 1106 (1989). Doubts as to the constitutional validity of "transient jurisdiction," so called, that may have arisen from *Shaffer* v. *Heitner*, 433 U.S. 186, 199-216 (1977), have been put to rest by *Burnham* v. *Superior Ct. of Cal.*, 110 S. Ct. 2105, 2110-2117 (1990).[4] Thus, the motion

---

[4]The *Burnham* decision, although unanimous as to result, split the Court as to breadth of the holding. Four Justices concurred in the view of Justice Scalia that service on one voluntarily present in a State confers jurisdiction without qualification. 110 S. Ct. at 2110-2113. Justice Brennan, writing for four Justices, agreed that "the Due Process Clause of the Fourteenth Amendment generally permits a state court to exercise jurisdiction over a defendant if he is served with process while voluntarily present in the fo-

to dismiss could not properly have been allowed under Mass.R.Civ.P. 12(b)(2-5), 365 Mass. 755 (1974).

2. *Parol evidence rule*. The judge dismissed count one, sounding in breach of contract, in reliance on the parol evidence rule. The defendants had argued that Maxi and Rake Oy could have no duty to issue the class B, non-voting shares unless the plaintiff had complied with his obligations under the written contract: namely, to pay Maxi $35,000 on signing the contract and $35,000 forty-five days thereafter. The plaintiff cannot rely (the defendants argue) on an oral agreement allegedly reached before the execution of the written agreement without violating the parol evidence rule.

On the state of the record before the trial court, a conclusion to that effect was premature. In some circumstances an oral agreement modifying the terms of a later-signed written agreement goes directly to the question whether the written document is an integrated statement of the entire agreement of the parties. See *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 712 & n.7 (1990).[5] A finding that the writing is not an integrated statement of the parties' agreement can open the way for proof of other elements of the agreement. *Antonellis* v. *Northgate Constr. Corp.*, 362 Mass. 847, 849-851 (1973). This is so despite the fact that courts have been reluctant, as the defendants argue, to allow proof of terms that contradict those of the written agreement, see, e.g., *Carlo Bianchi & Co.* v. *Builders' Equip. & Supplies Co.*, 347 Mass. 636, 643-644 (1964); *Alexander* v. *Snell*, 12

---

rum State," 110 S. Ct. at 2120, and that "[t]he transient rule is consistent with reasonable expectations and is entitled to a strong presumption that it comports with due process," 110 S. Ct. at 2124.

[5]The plaintiff alleges in the amended complaint that the cover note that accompanied the contract (which had been signed by Cederberg in Helsinki and then sent to the plaintiff for signing) assured the plaintiff that he could disregard the payment provision as written in the share-purchase contract. Compare *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. at 711 & n.5. A copy of the cover note, signed by Saraheimo, was attached to the amended complaint. There is authority for treating such a cover letter amendment, accepted by the other party, as effecting a modification of the written contract. See 3 Corbin, Contracts § 577, at 391 (1960).

Mass. App. Ct. 323, 324-325 (1981), at least in the absence of fraud (discussed below).[6]

It is open to parties to modify a written agreement by a later agreement not in writing. See *Zlotnick* v. *McNamara*, 301 Mass. 224, 225-226 (1938). The later agreement may be proved through the conduct of the parties. See *Flynn* v. *Wallace*, 359 Mass. 711, 715 (1971); *Church of God in Christ, Inc.* v. *Congregation Kehillath Jacob*, 370 Mass. 828, 832-834 (1976); *First Pa. Mort. Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 625 (1985). On parallel reasoning, where the parties' conduct after signing the written agreement conforms with a previous oral modification, rather than with the terms of the written agreement, it may reasonably be inferred that the parties have agreed after the signing to be bound by the oral modification of the written contract, ratifying it, in effect, by their conduct. Here the plaintiff alleges that Maxi accepted his payment of $20,000 for the shares of stock after his 1986 compensation was calculated and, indeed, later refunded $5,000 to him after it was determined that his compensation had been undercalculated by that amount. In the face of those allegations, it cannot be said as matter of law that the orally-agreed-to arrangement is unenforceable.

3. *Fraud.* The amended complaint alleges that the plaintiff insisted on a written contract as a condition to his rendering management consultant services and, in effect, that the defendants' undertaking to let him purchase equity in Maxi was a substantial inducement for his services. The amended complaint and the attachments thereto allege that Maxi, speaking through Cederberg, promised the plaintiff shares in Maxi subject to agreed-upon terms of payment. The plaintiff further alleges that Saraheimo, who "frequently acted for . . . Cederberg and Rake Oy in matters concerning Maxi,"

---

[6]Compare cases approving the use of parol to clarify the meaning of ambiguous terms of an integrated agreement, where it is often mentioned that such evidence may be received to explain but not to vary the terms of the written agreement. E.g., *Roberts Indus., Inc.* v. *Spence*, 362 Mass. 751, 753-754 (1973).

assured the plaintiff that he need not abide by the terms of the share purchase agreement requiring that half the purchase price be paid at the time of signing.

The plaintiff's allegation that Cederberg, from the outset, had no intention of issuing and transferring the class B shares is a sufficient allegation of fraud to withstand a motion to dismiss, as a false statement of a present intent to do a future act may serve as the predicate for an action in fraud. *Feldman* v. *Witmark*, 254 Mass. 480, 482 (1926). *Cellucci* v. *Sun Oil Co.*, 2 Mass. App. Ct. 722, 730 (1974), *S.C.*, 368 Mass. 811 (1975). Similarly, with regard to Saraheimo's statement, a party induced to sign an agreement by an assurance that the other party will refrain from invoking one of its terms is entitled to relief if the other party's actual intention is to the contrary. *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. at 711 & n.5.[7] The complaint states the circumstances constituting fraud with the requisite particularity. Mass.R.Civ.P. 9(b), 365 Mass. 751 (1974). The allegations indicate the statements made, the period in which they were made, their falsity and the defendant's knowledge of their falsity, as well as the plaintiff's detrimental reliance thereon. *Friedman* v. *Jablonski*, 371 Mass. 482, 488-489 (1976).

4. *Unfair and deceptive trade practices.* The judge dismissed the third count, alleging unfair and deceptive trade practices under G. L. c. 93A, § 11; he wrote (on the motion), "[C]hapter 93A does not cover this type relationship." The defendants advance two grounds for sustaining that ruling. The first is that G. L. c. 93A, § 11, does not cover disputes arising out of an employment relationship. *Manning* v. *Zuckerman*, 388 Mass. 8, 11-15 (1983). *Weeks* v. *Harbor Natl. Bank*, 388 Mass. 141, 144 (1983). *Dorfman* v. *TDA Indus., Inc.*, 16 Mass. App. Ct. 714, 720-721 (1983). The

---

[7]Although the complaint does not expressly impute that intent to Saraheimo, it is wholly consistent with and reasonably implied in the allegation that Cederberg (to whom Saraheimo answered) intended from the outset not to live up to the agreement insofar as it called for the issuance of class B shares.

second is that G. L. c. 93A, at least as in effect prior to St. 1987, c. 664, § 1,[8] did not apply to transactions in securities. *Cabot Corp* v. *Baddour*, 394 Mass. 720 (1985). *Levine* v. *Tucker, Anthony & R.L. Day, Inc.*, 395 Mass. 1004, 1005 (1985).

Both contentions have merit, but neither is sure of success in the circumstances posed by the amended complaint. According to its allegations, the plaintiff was engaged as an independent consultant, not as an employee. It can reasonably be argued that the consultant service contracted for, namely, that the plaintiff should be the full-time general manager of Maxi, was sufficiently analogous to an employment relationship as to fall outside the concept of " 'any trade or commerce directly or indirectly affecting the people of this Commonwealth,' " *Manning* v. *Zuckerman*, 388 Mass. at 14, quoting from G. L. c. 93A, § 1(*b*), that it should not be treated as a marketplace transaction but rather as one "principally 'private in nature.' " *Ibid.*, quoting from *Lantner* v. *Carson*, 374 Mass. 606, 608 (1978). That analysis would represent, however, an extension of existing law. Similarly uncertain is the application of the *Cabot Corp.* decision, the preemption analysis of which was based on an inference that the Legislature, when it established the intricate remedial scheme of G. L. c. 110A, did not intend that the securities transactions subject thereto should be governed simultaneously by the more generalized remedial scheme of G. L. c. 93A. The scheme of c. 110A, geared primarily to protecting securities buyers from fraudulent representations, probably offers no remedy to one whose chief complaint is nondelivery of shares promised. It is possible also to read the *Cabot Corp.* decision as not applying to a large contractual arrangement, such as could be found here, where only one component of the larger contract involves a securities trans-

[8]That act amended G. L. c. 93A, § 1, to include within the definition of "trade" and "commerce" "any security as defined in subparagraph (k) of [G. L. c. 110A, § 401]." Assuming that that amendment overruled *Cabot Corp.* (a question we need not decide), the amendment did not take effect until a date after January 5, 1988, subsequent to the alleged acts of deceit for which the plaintiff seeks relief.

action. Without suggesting that the *Cabot Corp.* decision may not properly be read as broadly precluding resort to c. 93A where a transaction involves securities, we think that the preferable practice, where the underlying question of law is subject to doubt, is to decide that question on a record of facts rather than on a record of allegations that may or may not prove true. Compare *Fabrizio* v. *Quincy*, 9 Mass. App. Ct. 733, 734 (1980); *Bishara* v. *Brown, Daltas & Assocs.*, 21 Mass. App. Ct. 941, 944 (1985).

Accordingly, without ruling that the plaintiff can overcome the suggested defenses, we reverse the dismissal of the third count.

5. *Tortious interference with contract.* The fourth count seems to set out a claim for relief only against Cederberg, implicitly (and correctly) recognizing that Maxi cannot be guilty of tortious interference with its own contract. See *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 663 n.3 (1981); *Riseman* v. *Orion Research Inc.*, 394 Mass. 311, 314 (1985). Conceivably, one in the position of chief executive officer, such as Cederberg, might be so closely identified with the corporation itself, and with its policies, that he should not be treated as a third person in relation to corporate contracts, susceptible to charges of tortious interference when he causes the corporation to breach its contractual obligations. The point is not argued, however, and should not be considered in any event on the bare allegations of the complaint. Compare *Bishara* v. *Brown, Daltas & Assocs.*, 21 Mass. App. Ct. 941, 943-944 (1985).

Count four of the complaint alleges that Cederberg's refusal to honor Maxi's contract with the plaintiff or to issue the new class B shares, after the plaintiff had complied with his obligations under the contract, "constituted an intentional interference with a contract between [p]laintiff and [d]efendant Maxi, by virtue of which [p]laintiff has been greatly damaged." This statement of the claim does not set out the elements of a cause of action for tortious interference with a contractual relationship. A claim of tort liability for intentional interference with a contract is not made out un-

less the interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811, 816 (1990). The "[d]efendant's liability may arise from improper motives or from the use of improper means. . . . No question of privilege arises unless the interference would be wrongful but for the privilege; it becomes an issue only if the acts charged would be tortious on the part of an unprivileged defendant." *Ibid.*, quoting from *Top Serv. Body Shop, Inc.* v. *Allstate Ins. Co.*, 283 Or. 201, 209-210 (1978).

A motion to dismiss under rule 12(b)(6) does not necessarily lie where the complaint merely fails to plead an element of a cause of action. Compare *Epstein* v. *Liberty Bank & Trust Co.*, 12 Mass. App. Ct. 1000 (1981). The traditional statement of the principle governing dismissals for legal insufficiency is that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Nader* v. *Citron*, 372 Mass. 96, 98 (1977), quoting from *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957). A vague complaint rarely meets this standard, but a complaint that is sufficiently detailed may afford a fair basis for a determination that an element essential to make out a cause of action is not alleged and will not be established. *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 615 (1983). *Madsen* v. *Erwin*, 395 Mass. 715, 731 (1985). *Fabrizio* v. *Quincy*, 9 Mass. App. Ct. 733, 734 (1980).

The verified complaint in this case is detailed in its recitation of facts, and further detail has been supplied through the unrebutted portions of the affidavits and counter-affidavits filed by the parties. These materials sufficiently establish that the wrongful conduct attributed to Cederberg is twofold: first, inducing the plaintiff to render management services by asserting, falsely, an intention to permit the plaintiff to acquire equity in Maxi; and, second, failing to honor Maxi's contractual obligation to issue class B stock to the plaintiff. The second plainly fails to meet the otherwise-wrongful standard defined in *United Truck Leasing Corp* v. *Geltman*; the

first involves a fraudulent misrepresentation, but the misrepresentation was involved in the *formation* of the contract, not in inducing the alleged breach. Contrast Restatement (Second) of Torts § 767(a), comment c, at 30 (1979), discussing liability for interference with a contract through fraudulent misrepresentations.[9] It was not error to dismiss count four.

6. *Conclusion.* In view of the fact that the case will be remanded for trial or other proceedings on counts one, two, and three, it is not necessary to reach the plaintiff's argument that it was error for the judge to dismiss the complaint without addressing a motion to add a new, fifth count, relating to an alleged breach of the management consultant contract. The motion, which is neither belated nor likely to delay trial, will, we assume, be allowed in the regular course. See *Castellucci* v. *United States Fid. & Guar. Co.*, 372 Mass. 288, 289-290 (1977).

The judgments are reversed. The orders dismissing the complaint are reversed as to counts one, two, and three and are affirmed as to count four. The plaintiff is to have costs of appeal. The case is remanded for further proceedings consistent herewith.

*So ordered.*

---

[9]*United Truck Leasing Corp.* v. *Geltman*, 406 Mass. at 817 n.10, cites § 767 of the Restatement as descriptive of the "seven general factors to be considered in determining whether an act of interference is improper."