Celia G. ZIMMERMAN,
Plaintiff, Appellee,

v.

DIRECT FEDERAL CREDIT UNION
and David Breslin, Defendants,
Appellants.

No. 01–1007.

United States Court of Appeals,
First Circuit.

Heard July 31, 2001.

Decided Sept. 4, 2001.

Harvey Weiner, with whom John J. O'Connor, Peabody & Arnold LLP, A. Van C. Lanckton, Daniel C. Reiser, and Craig and Macauley Professional Corporation were on brief, for appellants.

Juliane Balliro, with whom Robert D. Friedman, Susan E. Stenger, and Perkins, Smith & Cohen, LLP were on brief, for appellee.

Before SELYA, Circuit Judge, GIBSON,[*] Senior Circuit Judge, and LIPEZ, Circuit Judge.

SELYA, Circuit Judge.

This appeal is the aftermath of a jury verdict that awarded plaintiff-appellee Celia Zimmerman $200,000 in compensatory damages and $400,000 in punitive damages on her claim for retaliation and an additional $130,000 in compensatory damages on her claim for tortious interference with advantageous relations.[1] Resolving the appeal requires us to realign the standard of review applicable to appeals from punitive damage awards in light of recent Supreme Court precedent. Before reaching this issue, however, we first must ponder two antecedent questions: (1) Does the evidence suffice to sustain the jury's finding of tortious interference with advantageous relations? (2) Were the trial court's jury instructions on compensatory damages adequate despite the court's failure to address a plausible concern raised by the appellants? We answer these two questions in the affirmative, uphold the punitive damage award, and affirm the judgment below.

## I. BACKGROUND

We recount the facts as the jury supportably could have found them, resolving

---

[*] Hon. John R. Gibson, of the Eighth Circuit, sitting by designation.

1. At first blush, it appears that the compensatory damage awards may be duplicative (or, at least, overlapping). Since the parties have not raised any question in this regard, we do not pursue the point.

conflicts where appropriate in favor of the prevailing party.

The plaintiff is a woman of considerable attainment. She graduated from Princeton University, earned a master's degree in business administration from Southern Methodist University, and held a variety of positions in the financial sector. In September 1994, she accepted employment with defendant-appellant Direct Federal Credit Union (Direct) as its manager of financial planning and analysis. Direct's chief executive officer, defendant-appellant David Breslin, hired the plaintiff and led her to believe that her new post offered promising opportunities for advancement.

Her first sixteen months with Direct were a tour de force. Joseph Capalbo, Direct's vice-president and controller, was slated to be her immediate supervisor, but Capalbo was absent for a long stretch of time due to his wife's demise. The plaintiff assumed many of his responsibilities and handled them admirably. She received successive promotions—eventually becoming director of finance—with concomitant pay raises and bonuses. At Breslin's request, she attended all but two of the twenty meetings of the board of directors held during that sixteen-month period and made presentations at fourteen of them. She also coordinated the annual senior management strategic planning retreat. By the end of 1995, she had a sizable staff and was functioning successfully as Direct's de facto controller. Her performance reviews sang her praises, describing her as a "team player" and a "role model."

In January of 1996, the plaintiff learned that she was pregnant and communicated that fact to Breslin. The next day, Breslin trimmed her responsibilities and reduced the size of her staff. Approximately two months later, the plaintiff developed toxemia, and her physician prescribed episodic bed rest throughout the day. Breslin initially agreed to accommodate her but then undercut the agreement by assigning her tasks to be performed during the allotted rest periods. The plaintiff was forced to leave the building entirely to obtain needed rest.

The plaintiff gave birth to her son in July of 1996. The baby was born prematurely and the plaintiff took maternity leave. She then took some additional time to address other non-pregnancy-related medical issues. When she returned to work in December, she discovered that her job had changed dramatically: she had been stripped of her management role and Capalbo had assumed most of her responsibilities. She was moved into a smaller office (which she shared with a noisy wire transfer machine), given duties of modest importance, and excluded from high-level discussions (including board meetings). To compound these indignities, Breslin shunned her, communicating only through Capalbo.

On March 3, 1997, the plaintiff filed a complaint with the Massachusetts Commission Against Discrimination (MCAD). In it, she charged Direct and Breslin with discrimination based on sex and pregnancy. She hand-delivered a copy of her complaint to Breslin two days later, hoping that he would begin addressing her concerns. Breslin reacted badly, storming from office to office to speak to other executives, and closing the door behind him each time. Although the plaintiff thereafter was invited to some management meetings, she was excluded from the 1997 senior management retreat (an event which she previously had organized). Moreover, Breslin routinely ignored her attempts to participate during the meetings she attended and spoke about her in the third person as if she were not there. To make matters worse, she repeatedly

was assigned to projects unrelated to the finance function (e.g., facility redesign) and to monotonous tasks, beneath her pay grade, with which she had no prior experience (e.g., underwriting twenty to thirty home equity loans per day).

In April of 1997, the plaintiff received an uncharacteristically poor performance review of her teamwork. The next month, Direct and Breslin responded to the MCAD complaint, denying the plaintiff's allegations and attacking her credibility. In due course, the plaintiff preempted the administrative proceedings by filing suit in a Massachusetts state court charging, inter alia, gender and pregnancy discrimination, retaliation, intentional infliction of emotional distress, tortious interference with advantageous relations, and various statutory violations (e.g., violations of the Family and Medical Leave Act, the Equal Pay Act, the Massachusetts Civil Rights Act, and the Massachusetts Equal Rights Act).[2] Direct and Breslin removed the case to the federal district court. *See* 28 U.S.C. §§ 1331, 1441.

The institution of suit did nothing to calm troubled waters. Breslin held a company-wide meeting in which he humiliated the plaintiff, pointedly stating that a certain person was not "woman enough to come face to face with me" and suggesting that bonuses would be larger if certain employees would leave as expected. At about the same time, Capalbo instructed the plaintiff to prepare presentations for a board meeting, giving her only four days' notice for a project that involved unfamiliar areas. Breslin reported to the board on the status of the plaintiff's lawsuit, then asked her to join the meeting and deliver her report. The plaintiff was not invited to attend any further board meetings.

Breslin and Capalbo continued to tinker with the plaintiff's job description, repeatedly assigning her menial chores or duties unrelated to her expertise. Breslin also made repeated attempts to set the plaintiff's coworkers against her, quoting liberally, if not always accurately, from the plaintiff's journal (which he had obtained in the course of pretrial discovery). Steve Hagerstrom, a Direct executive who was known to be sympathetic to the plaintiff, was a particular target of Breslin's wrath; on one occasion after Hagerstrom had defended the plaintiff, Breslin told him that he "didn't understand why a talented guy such as [Hagerstrom] would stay at Direct in such a hot economy if [he] had obvious negative feelings toward [Breslin]." While these events were taking place the plaintiff received declining performance reviews, often with little or no explanation as to why her scores had decreased.

In June of 1998, the plaintiff sought psychiatric help to cope with mounting work-related stress. The psychiatrist diagnosed a severe depressive disorder, advised her not to return to work, and started her on antidepressant medication. After a three-month absence, Direct terminated her employment. The plaintiff's depression had improved only marginally by the time of trial, and she was still unable to function as a normal person (much less work).

Meanwhile, the parties consented to proceed before a magistrate judge. *See* 28 U.S.C. § 636(c). The judge winnowed the plaintiff's claims, disposing of her claim for intentional infliction of emotional distress and various statutory initiatives by summary judgment. As winnowed, the plaintiff's case came on for jury trial in January of 2000. The trial lasted for fifteen days. During that span, the plaintiff voluntarily

---

2. The plaintiff's husband, James, sued for loss of consortium. Since his claim was purely derivative and, in all events, rejected by the jury, we do not allude further to it.

discontinued her Title VII claims and one of her state-law discrimination claims. On February 9, 2000, the jury returned a split verdict. The jurors found that the appellants had neither discriminated against the plaintiff nor violated the Family and Medical Leave Act. They simultaneously found in the plaintiff's favor on her state-law retaliation claim against both appellants and on her tortious interference with advantageous relations claim against Breslin. The plaintiff was awarded $200,000 in compensatory damages and $400,000 in punitive damages on the former claim and $130,000 in compensatory damages on the latter.

The appellants promptly moved for judgment as a matter of law or for a new trial. *See* Fed.R.Civ.P. 50(b), 59(e). Among other things, they questioned the sufficiency of the evidence on the tortious interference claim and argued that the punitive damage award should be set aside or, at least, reduced substantially. The magistrate judge denied the motions in a closely reasoned opinion. As to tortious interference, he found that "a reasonable jury could readily conclude that Breslin acted with a vindictive motive and that he, both individually and by means of Capalbo, undertook a deliberate, calculated, systematic campaign to humiliate and degrade Zimmerman both professionally and personally." As to punitive damages, the magistrate judge concluded that the jury had an adequate evidentiary basis to find that Breslin "engaged in a vendetta" and that such conduct merited an award of punitive damages against both appellants. Finally, the magistrate judge determined that the damages awarded (both compensatory and punitive) were reasonable in amount.

This appeal followed. In it, the appellants renew their challenge to the sufficiency of the evidence of tortious interference. They also aver that the magistrate judge erred in refusing to give a requested jury instruction. Finally, they ask us to revisit the punitive damage award. We consider these three assignments of error separately.[3]

## II. TORTIOUS INTERFERENCE WITH ADVANTAGEOUS RELATIONS

We review the denial of Breslin's motion for judgment as a matter of law de novo. *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1191 (1st Cir.1995). A motion for judgment as a matter of law only may be granted when, after examining the evidence of record and drawing all reasonable inferences in favor of the nonmoving party, the record reveals no sufficient evidentiary basis for the verdict. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Gibson v. City of Cranston*, 37 F.3d 731, 735 (1st Cir.1994). In the course of this review, the court may not weigh the evidence, undertake credibility determinations, or engage in differential factfinding. *Colasanto v. Life Ins. Co. of N. Am.*, 100 F.3d 203, 208 (1st Cir.1996). In the end, the jury's verdict must stand unless the evidence, taken in the light most favorable to the prevailing party, points unerringly to an opposite conclusion. *Id.*

Breslin's motion for judgment as a matter of law questioned the sufficiency of the evidence on the tortious interference count. He raises the same question on appeal. The elements of the tort are uncontroversial: to prevail on a tortious

---

**3.** To the extent that the appellants hint at other assignments of error, their efforts are insufficiently developed, obviously futile, or both. Thus, we reject any such overtures out of hand.

interference claim, a plaintiff must demonstrate (1) that she had a business relationship, (2) that the defendant knew of this relationship, (3) that the defendant intentionally and maliciously interfered with the relationship, and (4) that the defendant's actions harmed her. *Comey v. Hill,* 387 Mass. 11, 438 N.E.2d 811, 816 (1982).

■ Tortious interference takes an intriguing turn in the employment context. Common sense suggests that an employee may not sue her employer for interfering with its own contract, and the case law verifies this intuition. *Harrison v. Netcentric Corp.,* 433 Mass. 465, 744 N.E.2d 622, 632 (2001). Despite the employer's immunity, however, a supervisor may be personally liable if he tortiously interferes with a subordinate's employment relationship. *Steranko v. Inforex, Inc.,* 5 Mass. App.Ct. 253, 362 N.E.2d 222, 235 (1977). This seeming paradox has led the Massachusetts courts to construct a matrix of rules designed to ensure against irrational results.[4]

One element of this matrix has special relevance here. The Massachusetts Supreme Judicial Court (SJC) has held that a defendant-supervisor is entitled to a qualified privilege in an employment-based tortious interference case (and, thus, will not be liable for employment decisions that are within the scope of his supervisory duties). *See Gram v. Liberty Mut. Ins. Co.,* 384 Mass. 659, 429 N.E.2d 21, 24 (1981). The court adopted this limitation to allay a supervisor's fear of personal liability when the occasion arises for that supervisor to make an adverse employment decision on behalf of the employer. *Id.* Withal, the privilege is not sacrosanct. Massachusetts treats proof of actual malice as a proxy for proof that a supervisor was not acting on the employer's behalf, and deems such proof sufficient to overcome the qualified privilege.[5] *See id.*

■ Proof of actual malice requires more than a showing of mere hostility. *See King v. Driscoll,* 418 Mass. 576, 638 N.E.2d 488, 495 (1994) (explaining that "personal dislike will not warrant an inference of the requisite ill will"). For one thing, the plaintiff must prove that malice was the controlling factor in the supervisor's interference. *Alba v. Sampson,* 427

---

4. A more nuanced set of rules applies in a suit against a supervisor who is so closely connected to a corporate employer as to be considered its alter ego. *See Harrison,* 744 N.E.2d at 633 (observing, in dictum, that courts frown upon a "tortious interference claim against an individual decision maker who is indistinguishable from the corporation itself"); *Schinkel v. Maxi–Holding, Inc.,* 30 Mass.App.Ct. 41, 565 N.E.2d 1219, 1225 (1991) ("Conceivably, one in the position of chief executive officer ... might be so closely identified with the corporation itself, and with its policies, that he should not be treated as a third person in relation to corporate contracts, susceptible to charges of tortious interference when he causes the corporation to breach its contractual obligations."). Because Breslin does not contend that he is Direct's alter ego, we need not probe this point.

5. In allowing plaintiffs to overcome the qualified privilege by a showing of actual malice, Massachusetts is far more plaintiff-friendly than other jurisdictions. In some states, a plaintiff must demonstrate that the defendant-supervisor acted both with malice and outside the scope of his employment. *E.g., George A. Fuller Co. v. Chicago Coll. of Osteo. Med.,* 719 F.2d 1326, 1333 (7th Cir.1983) (applying Illinois law); *McGanty v. Staudenraus,* 321 Or. 532, 901 P.2d 841, 847 (1995). Texas, in particular, stringently protects the privilege: if a corporation does not later excoriate the supervisor or renounce his acts, then that supervisor is deemed to have been acting in the corporate interest. *See Powell Indus., Inc. v. Allen,* 985 S.W.2d 455, 457 (Tex.1998).

Mass. 1104, 44 Mass.App.Ct. 311, 690 N.E.2d 1240, 1243 (1998). For another thing, "[a]ny reasonable inference of malice must ... be based on probabilities rather than possibilities." *Gram*, 429 N.E.2d at 24–25 (citation omitted). Finally, such an inference requires an affirmative showing that the actions taken by the supervisor were not derived from a desire to advance the employer's legitimate business interests. *Boothby v. Texon, Inc.*, 414 Mass. 468, 608 N.E.2d 1028, 1040 (1993); *Alba*, 690 N.E.2d at 1243.

Certain situations lend themselves to proof of malice. Pertinently, the SJC has held that the elements underlying a claim for unlawful discrimination may be used to demonstrate malice in the context of a tortious interference claim. *See Comey*, 438 N.E.2d at 817. We think it follows logically that the elements underlying a claim for unlawful retaliation may be used to show malice when a tortious interference claim is brought against a supervisor in a loss-of-employment case. Although not a straightforward "single employer" situation, *Draghetti v. Chmielewski*, 416 Mass. 808, 626 N.E.2d 862, 868–69 (1994), seems to establish the validity of this proposition as a matter of Massachusetts jurisprudence.

Draghetti was a police officer who also held a part-time job as an instructor at a police academy. His supervisor on the police force, Chmielewski, wrote a letter to the director of the academy, falsely stating that Draghetti had scheduling problems. *Id.* at 865. The supervisor urged Draghetti's replacement, and the director obliged. *Id.* In the litigation that followed, Draghet-ti prevailed on a tortious interference claim against Chmielewski.

The SJC upheld the verdict: because the record supported a finding that Chmielewski likely retaliated against Draghetti for Draghetti's union activities and testimony on behalf of a police officer suspended by Chmielewski, the jury could have inferred that Chmielewski had an "improper motive." *Id.* at 869. *Draghetti* thus stands for the proposition that, in a tortious interference case under Massachusetts law, proven retaliation may constitute an improper motive. Since "[t]here is no practical difference ... between 'actual malice' and *improper* motives and means for the purposes of [tortious interference]," *Harrison*, 744 N.E.2d at 633 n. 16, proven retaliation may serve as a proxy for actual malice.

■ With this background, we turn to the case at bar. Breslin's argument boils down to a claim that the plaintiff did not sufficiently overcome the qualified privilege. He contends that the evidence reveals only a series of slights which cannot, as a matter of law, amount to malice in this context. But Breslin's failure to appeal from the jury's finding of intentional retaliation under Mass. Gen. Laws ch. 151B, § 4 undermines his argument.[6] The jury had an opportunity to review the evidence in full and gauge the veracity of the witnesses. Its evaluation—that Breslin had unlawfully retaliated against the plaintiff for filing a complaint with the MCAD— was verified by the impressions of the judicial officer who presided over the trial. The commission of such unlawful discriminatory acts suffices to ground a reasonable

---

**6.** Breslin attributes this stratagem to the allegedly repressive effect of our decision in *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 47–52 (1st Cir.1999), adding that his decision not to appeal "by no means" indicates acquiescence in the jury's finding. Breslin cannot have it both ways. Whatever his reason for not appealing, the fact remains that the unappealed finding is the law of the case (and, thus, appropriately may be treated as compelling evidence of actual malice).

inference that Breslin's motives were illegitimate and that his interference had no relationship to any proper corporate purpose. No more is necessary to sustain a finding of actual malice. *See Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 589 N.E.2d 1241, 1246 (1992) (holding that a "spiteful, malignant purpose, unrelated to the legitimate corporate interest," suffices to show actual malice) (citation omitted).

■ To cinch matters, we have conducted an independent review of the record. We agree with the magistrate judge that the evidence presented at trial, when arrayed in the light most flattering to the plaintiff, is sufficient to demonstrate malice on Breslin's part and to warrant an illation that his acts fell outside the scope of his employment. Breslin's deliberate humiliation of the plaintiff at both the company-wide meeting and before the board of directors denotes something more pernicious than mere personal dislike (or so reasonable jurors could have thought). *Cf. King*, 638 N.E.2d at 495 (holding that the pursuit of additional financial gain did not constitute an improper motive). Breslin's use of the plaintiff's diary is also apposite. He effectively drove a wedge between the plaintiff and her colleagues, poisoning her working relationships. On the basis of this evidence, the jury reasonably could have inferred (as it apparently did) that Breslin's interference sank to depths more peccant than mere slights and that he acted with actual malice.

We need not paint the lily. Courts traditionally defer to the wisdom of juries in the resolution of fact-sensitive questions. *Mailhiot v. Liberty Bank & Trust Co.*, 24 Mass.App.Ct. 525, 510 N.E.2d 773 (1987), illustrates the point in the tortious interference context. There, the treasurer of a bank had refused to sign a treasurer's report without speaking to the board of directors, asserting that she was attempting to safeguard the bank against the bank president's improper accounting practices. *Id.* at 776. The president responded by advising the board of the plaintiff's alleged shortcomings and successfully urging her dismissal. *Id.* In the subsequent suit, the jury rejected the plaintiff's claim against the board for wrongful discharge, yet awarded damages against the bank president for tortious interference. The appeals court upheld the verdict, noting that the plaintiff had introduced evidence that the president had fabricated certain allegations. *Id.* This, the court held, was enough to sustain a finding of actual malice. *Id.* The same sort of analysis holds true in this case: we defer to the jury's record-rooted determination that the plaintiff, having proved unlawful retaliation, also proved the existence of an improper motive (and, thus, proved actual malice). Accordingly, we reject Breslin's claim that the evidence does not suffice to ground a finding of tortious interference.

## III. JURY INSTRUCTIONS

We now turn to the issue of whether the magistrate judge erred in charging the jury. The appellants fault the magistrate judge because, notwithstanding their timely request, he did not specifically instruct the jurors to disregard all damages attributable to litigation-related stress. The appellants speculate that, absent such an instruction, the jury may have awarded compensatory damages for injuries unrelated to the underlying claims.

■ Because the appellants properly preserved their objection to the omission of the desired instruction, our review is for abuse of discretion. *Elliott v. S.D. Warren Co.*, 134 F.3d 1, 6 (1st Cir.1998). We will set aside the verdict only if the omitted instruction was (1) correct as a matter of substantive law, (2) not substantially

covered in the charge as a whole, and (3) integral to an important point in the case. This standard weighs in the trier's favor: "A trial court is obliged to inform the jury about the applicable law, but, within wide limits, the method and manner in which the judge carries out this obligation is left to his or her discretion." *Id.* In short, no party "is entitled to dictate the turn of phrase the judge should use to acquaint lay jurors with the applicable law." *Id.*

■■ In this instance, the appellants' proffered instruction correctly stated the law. Even though the SJC has not passed directly on the point, the heavy weight of authority holds that litigation-induced stress is not ordinarily recoverable as an element of damages. *See Picogna v. Bd. of Educ. of Cherry Hill,* 143 N.J. 391, 671 A.2d 1035, 1038 (1996) (collecting cases). Sound policy reasons support this rationale: as a general rule, a putative tortfeasor should have the right to defend himself without risking a more munificent award of damages merely because the strain inherent in an actual or impending courtroom confrontation discomfits the plaintiff. As Judge Posner observed, "[i]t would be strange if stress induced by litigation could be attributed in law to the tortfeasor." *Stoleson v. United States,* 708 F.2d 1217, 1223 (7th Cir.1983).

The appellants are less successful on the remaining portions of the inquiry. As to the second prong, it is important to note that the omitted instruction related to compensatory damages. The judge told the jurors that if they found for the plaintiff on the issue of retaliation, they should award her those compensatory damages "which were proximately caused by the ... retaliation." In the same vein, the

judge admonished that "damages in general and emotional damages in particular must be causally connected to the ... retaliation to be recoverable." He then added:

> [Y]ou are not to award any damages for any injury or condition from which the plaintiff may have suffered or may now be suffering unless it has been established by a preponderance of the evidence in the case that the particular injury for which damages are sought was caused by the [retaliation].

Later in the charge, the judge stated:

> You may award the plaintiff damages which will compensate her reasonably for any emotional distress or mental anguish already suffered by her caused by the retaliation and for any ... emotional distress or mental anguish which you find from the evidence in the case that she is reasonably certain to suffer in the future from the same cause.

■■ We believe that these instructions sufficiently addressed the core concern raised by the appellants' proposed instruction—that the jury compensate the plaintiff only for damages caused by their acts of retaliation.[7] Jury instructions necessarily operate at a fairly high level of generality. *E.g., Elliott,* 134 F.3d at 7; *Kibbe v. City of Springfield,* 777 F.2d 801, 810 (1st Cir.1985). Consistent with this reality, a judge need not ruminate about every point of evidence nor instruct the jurors on how to weigh each bit of testimony. *See Interstate Litho Corp. v. Brown,* 255 F.3d 19, 29 (1st Cir.2001) ("A trial judge, who possesses particular insight into the main issues in a case, does not have an obligation to instruct a jury on every nuance of a par-

---

7. We discuss specifically compensatory damages for retaliation, but our comments apply with equal force to compensatory damages stemming from tortious interference. After

all, the magistrate judge charged the jury, without objection, to apply the same set of legal rules to the computation of compensatory damages under both rubrics.

ty's claim or defense."). Indeed, dangers often loom when a trial judge comments too specifically on the evidence. *See, e.g., Testa v. Wal–Mart Stores, Inc.,* 144 F.3d 173, 175 (1st Cir.1998) (explaining that a trial court instructing a jury must "walk a fine line—the court can err as easily by overinclusiveness as by underinclusiveness").

In the last analysis, "the central inquiry reduces to whether, taking the charge as a whole, the instructions adequately illuminate the law applicable to the controlling issues in the case without unduly complicating matters or misleading the jury." *United States v. DeStefano,* 59 F.3d 1, 3 (1st Cir.1995) (citation omitted). In the usual case, the judge fulfills this responsibility as long as he adverts to the critical issues and instructs the jurors on the general legal framework applicable to those issues. There is simply no legal requirement that a judge, called upon to instruct a jury in a complicated case, be precise to the point of pedantry. *See White v. N.H. Dep't of Corrections,* 221 F.3d 254, 264 (1st Cir.2000). Given that the court below told the jury no fewer than five times that the damages must be "caused by" the retaliation, this standard was satisfied.

If more were needed—and we doubt that it is—the appellants also fail to satisfy the third prong of this inquiry: they are unable to demonstrate that the requested instruction was integral to an important issue in the case. The appellants offer scant factual support for the instruction, identifying only two isolated vignettes in the course of a fifteen-day trial—the plaintiff's comment that she felt as if she had "Mount Everest in front of her" when she

received Direct's response to the MCAD complaint, and her psychiatrist's testimony that her downward spiral began on that day. This meager foundation hardly can support the weight that the appellants attempt to pile upon it. We therefore reject the appellants' self-serving assertion that litigation-induced stress was an important issue in the case which ought to have been singled out for special attention in the lower court's charge.[8] *See DeStefano,* 59 F.3d at 4 (warning against instructing on collateral matters that may "risk[ ] confusing and confounding the jury without supplying a scintilla of additional enlightenment"); *United States v. Fera,* 616 F.2d 590, 594 (1st Cir.1980) (upholding trial court's rejection of proffered jury instruction which did not relate to an important issue in the case). While the effects of litigation-induced stress may be a proper subject for inquiry and argument when the record evinces a realistic danger that the plaintiff will be awarded undeserved damages, the sketchy evidence here gives us no cause to believe that the magistrate judge abused his discretion by refusing to focus on that topic in his jury instructions.

To summarize, the standard of review cedes appreciable deference to the trial court in the formulation of jury instructions. Here, the magistrate judge repeatedly instructed the jurors to consider only those damages that resulted from the appellants' actions. Given the record as a whole, no more was exigible.

## IV. PUNITIVE DAMAGES

We now arrive at the primary focus of the appeal: the award of punitive

---

**8.** We are fortified in this view by the high correlation between the plaintiff's evidence of damages and the compensatory damages actually awarded. The record is replete with evidence of psychiatric problems, severe emotional distress, large hospital and medical ex-

penses, and substantial lost earnings (past and future), all causally linked to the plaintiff's (mis)treatment at the appellants' hands. Given this evidence, awards of $200,000 for retaliation and $130,000 for tortious interference seem well within bounds.

damages on the state-law retaliation count. Historically, the standard of review applied to punitive damage awards has not been a model of clarity. In diversity cases, we sometimes have utilized the same standard of review that obtains in state court. *E.g., Ansin v. River Oaks Furniture, Inc.,* 105 F.3d 745, 759 (1st Cir.1997). On other occasions, we have applied a bifurcated standard, reviewing de novo the legal question of whether the evidence suffices to justify an award, and if it does, reviewing the trial court's determinations as to excessiveness, inadequacy, and other amount-related questions for abuse of discretion. *E.g., McMillan v. Mass. SPCA,* 140 F.3d 288, 306 (1st Cir.1998). The Supreme Court, however, recently has clarified that, under the Due Process Clause of the Fourteenth Amendment, the amount of a punitive damage award presents a *legal* issue. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S.Ct. 1678, 1685–86, 149 L.Ed.2d 674 (2001). Thus, both the extent of a state-law punitive damage award and the sufficiency of the evidence on which it is premised engender de novo review in a federal appellate court. *See id.* Since *Cooper* supplants our prior precedents, we take a fresh look at the amount of the punitive damage award in this case.

 Where punitive damages are involved, de novo review is informed by principles of fundamental fairness. Those principles "dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 574, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). *BMW* furnishes three general guideposts for conducting such a review: (1) What is the degree of reprehensibility of the defendant's conduct? (2) What is the ratio between the compensato-

ry and punitive damages? (3) What is the difference between the punitive damage award and the civil penalties imposed for comparable conduct? *Id.* at 575, 116 S.Ct. 1589. These guideposts should neither be treated as an analytical straitjacket nor deployed in the expectation that they will "draw a bright line marking the limits of a constitutionally acceptable punitive damages award." *Id.* at 585, 116 S.Ct. 1589. Other pertinent factors may from time to time enter into the equation. When all is said and done, a punitive damage award will stand unless it clearly appears that the amount of the award exceeds the outer boundary of the universe of sums reasonably necessary to punish and deter the defendant's conduct. *Romano v. U–Haul Int'l,* 233 F.3d 655, 672 (1st Cir.2000).

In this instance, the jury awarded punitive damages for retaliation under Mass. Gen. Laws ch. 151B, § 4. While this statute does not provide for any ceiling on punitive damage awards, the SJC placed a relevant gloss on the issue of punitive damages in *Labonte v. Hutchins & Wheeler,* 424 Mass. 813, 678 N.E.2d 853 (1997). There, the SJC recommended that reviewing courts consider

> a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred; a reasonable relationship to the degree of reprehensibility of the defendant's conduct; removal of the profit of an illegal activity and be in excess of it so that the defendant recognizes a loss; factoring in of the costs of litigation and encourage plaintiffs to bring wrongdoers to trial; an examination whether criminal sanctions have been imposed; an examination whether other civil actions have been filed against the same defendant.

*Id.* at 862–63 (citing *BMW,* 517 U.S. at 589–92, 116 S.Ct. 1589 (Breyer, J., concur-

ring)). The SJC thus followed the same path as the *BMW* Court, requiring review of punitive damage awards to ensure that any such award "is reasonable and not simply a criminal penalty." *Id.* at 862.

■ We evaluate the punitive damage award in this case in light of the *BMW* guideposts, without deference to the trial court's appraisal. The first component of the inquiry—the degree of reprehensibility of the defendants' conduct—typically is the most telling indicium of the reasonableness *vel non* of a punitive damage award. *BMW*, 517 U.S. at 575, 116 S.Ct. 1589. The simple fact is that "some wrongs are more blameworthy than others." *Id.* In order to justify a substantial punitive damage award, a plaintiff ordinarily must prove that the defendants' conduct falls at the upper end of the blameworthiness continuum, or, put another way, that the conduct reflects a high level of culpability. *See id.*

The appellants argue that the record does not evince any behavior warranting an award of punitive damages. They see nothing egregious or outrageous about what they have done, but, rather, posit that the evidence, even when viewed favorably to the plaintiff, shows only slights and affronts. This argument lacks force.

■ The short but dispositive answer is that the appellants have not appealed the jury's adverse verdict on the retaliation claim and, thus, have left unchallenged a finding, supported by extensive evidence, that the harm inflicted was far more than wounded pride and hurt feelings. The *BMW* Court made plain that "evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would pro-

vide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Id.* at 576–77, 116 S.Ct. 1589. This statement finds considerable traction on the facts of this case, in which the jury rationally could have found that Breslin (and through him, Direct) mounted a deliberate, systematic campaign to punish the plaintiff as a reprisal for her effrontery in lodging a discrimination claim. The campaign involved abasing her, isolating her from her colleagues, and degrading her professionally. The appellants should have realized that this scurrilous course of conduct was unlawful, yet they persisted in it. Such a vendetta, to use the magistrate judge's apt description, is not only deserving of opprobrium but also flatly prohibited by Massachusetts law. Hence, the reprehensibility of the appellants' conduct can be viewed as calling for a substantial award of punitive damages.

The second *BMW* guidepost—the ratio between compensatory and punitive damages—points in the same direction. The Supreme Court has held that a 4:1 compensatory-to-punitive ratio does not "cross the line into the area of constitutional impropriety." *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 24, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Accordingly, the 2:1 ratio of compensatory to punitive damages awarded by the jury here presents no cause for concern.[9]

■ The final *BMW* guidepost directs a reviewing court to assess the punitive damage award in light of the complex of statutory schemes developed to respond to the same sort of underlying conduct. On this factor, "a reviewing court engaged in

---

9. We believe that it is appropriate to construct the ratio by looking only to the count on which punitive damages were awarded (here, the retaliation count). Were we to

widen the lens of inquiry and take into account the tortious interference count, the ratio would be smaller still (1.2:1).

determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *BMW,* 517 U.S. at 583, 116 S.Ct. 1589 (citations and internal punctuation omitted).

The appellants treat this guidepost as if it beckoned them, first and foremost, to compare this case to other decided cases. Thus, they stress the fact that this court has not upheld a punitive damage award in excess of $300,000 for harms that the appellants classify as similar. *E.g., Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194, 206–07 (1st Cir.1987) (reducing punitive damage award on retaliation claim from $3,000,000 to $300,000). They also argue that the statutory cap of $50,000 for punitive damages under Title VII, *see* 42 U.S.C. § 1981a(b)(3)(A), highlights the exorbitance of the award.

In our view, the appellants have misconstrued the nature and purpose of this guidepost. Decided cases are relevant, but positive law—statutes and regulations—are even more critical. Moreover, a reviewing court should search for comparisons solely to determine whether a particular defendant was given fair notice as to its potential liability for particular misconduct, not to determine an acceptable range into which an award might fall. In *BMW,* for example, the Court compared the multimillion dollar verdict with civil fines for the same behavior that ranged from $50 to $10,000. 517 U.S. at 584, 116 S.Ct. 1589. Since none of these statutes provided the defendant "with fair notice that the first violation . . . of [the Alabama statute's] provisions might subject an offender to a multimillion dollar penalty," the punitive damage award did not pass muster. *Id.*

Here, the appellants had sufficient notice. In another section of the very statute upon which the plaintiff sued, the Massachusetts legislature provided for the assessment of treble damages against perpetrators of intentional age discrimination. *See* Mass. Gen. Law ch. 151B, § 9. At the same time, the legislature left uncapped the damages stemming from other types of discrimination under that statute. In doing so, the legislature apparently intended to permit damage awards for other forms of discrimination—including the retaliation found here—greater than the treble damages for age discrimination. *See Fontaine v. Ebtec Corp.,* 415 Mass. 309, 613 N.E.2d 881, 889–90 (1993) (stating that "[i]t is not reasonable to assume that the Legislature intended to design a damages scheme which singles out age discrimination as significantly more egregious than, for example, racial or sexual discrimination").

This paradigm furnishes a far more trenchant source of notice than the comparisons that the appellants suggest. If the Court urges deference to legislative judgments, *BMW,* 517 U.S. at 583, 116 S.Ct. 1589, then the most prudent choice would be to follow the judgments embedded in the text of the statute upon which the suit is founded. Since the legislature provided explicit notice that the violator of one of the provisions of Chapter 151B could be liable for punitive damages several times greater than the compensatory award in the same case, the appellants were sufficiently on notice that retaliating against the plaintiff in violation of the statute potentially could subject them to a similar level of punitive damages.

We add, moreover, that even were we to accept the appellants' argument on its own terms, the punitive damage award in this case would not violate the due process principle of fair notice. Stripped of rhetorical flourishes, the appellants' core contention is that the case law did not give

them notice of an exposure to punitive damages of more than $300,000 for their behavior. But an award of $400,000 is not so far removed from the $300,000 figure as to render the award unfair. *Cf. BMW*, 517 U.S. at 585–86, 116 S.Ct. 1589 (explaining that the Due Process Clause proscribes punitive damage awards that are "*grossly excessive*") (emphasis supplied). "Fairness" in this context is a protean concept, and we must leave room for a certain amount of play in the joints.[10]

We turn finally to the additional factors mentioned in *Labonte*. These are meant as helpful suggestions, not as items in a mechanical checklist, *see Labonte*, 678 N.E.2d at 862, so we report only that none of them tip the scales in this case. Indeed, the most obviously relevant factor—the absence of other criminal or civil sanctions for the conduct at issue—militates quite strongly in favor of upholding the punitive damage award.

Having established that the amount awarded fits comfortably within the purview of the Due Process Clause, we need treat the appellants' challenge to the sufficiency of the evidence underlying the award in the briefest of terms. The appellants cite to three decisions of this court, *see Iacobucci v. Boulter*, 193 F.3d 14 (1st Cir.1999); *McMillan*, 140 F.3d at 308–09; *Hernandez–Tirado v. Artau*, 874 F.2d 866 (1st Cir.1989), and argue that these deci-

sions support a conclusion that the punitive damage award should be overturned completely. We do not agree. *Iacobucci* and *Hernandez–Tirado* pertain specifically to punitive damages awarded pursuant to 42 U.S.C. § 1983. In such cases, a plaintiff has a heightened burden: he must demonstrate that the defendant intentionally, or with conscious indifference, violated the plaintiff's federally protected civil rights. *See Iacobucci*, 193 F.3d at 26. Such a showing is neither necessary nor warranted under Massachusetts law, which permits punitive damages where the defendant's conduct was outrageous and engendered by evil motive or reckless indifference to the rights of others. *Dartt v. Browning–Ferris Indus., Inc.*, 427 Mass. 1, 691 N.E.2d 526, 537 (1998); *see also Dichner v. Liberty Travel*, 141 F.3d 24, 33 (1st Cir.1998) ("[C]ourts cannot automatically assume that punitive damages are available under Chapter 151B on the same basis as they are available to a plaintiff in a federal discrimination case."). *McMillan*, although decided under Massachusetts law, is inapplicable as well. The rejection of the punitive damage award there was wholly factbound.[11]

The short of it is that the appellants engaged in a course of behavior that a jury easily could have deemed outrageous and worthy of condemnation. The evidence thus supported a punitive damage award,

---

10. A second problem with the appellants' reasoning involves their near-exclusive reliance on judicial approval of punitive damage awards. If we were to accept this methodology, and carry it to its logical end point, we would in effect be adopting a judicially imposed ceiling on punitive damage awards. Such a decision would run counter to the rationale behind the third *BMW* guidepost—a guidepost that counsels deference to *legislative* judgments. It is not the courts' province to legislate in the place of the legislature.

11. In *McMillan*, the veterinarian plaintiff worked for the hospital defendant for twenty-two years. At one point, she sued the hospital for paying her significantly less than similarly situated male colleagues, but two years after filing, the hospital increased her salary to bring it in line. 140 F.3d at 296. Two years after that, the hospital terminated the plaintiff abruptly, disregarding its own procedures. *Id.* at 296–97. A jury awarded her $362,699.50 in compensatory damages and $306,912.50 in punitive damages. *Id.* at 297. This court rejected the punitive damages out of hand. *Id.* at 308–09.

and the appellants had fair notice of its potential size. As such, the award presents no legal or factual impediment that would warrant disturbing it.

## V. CONCLUSION

We need go no further.[12] For the reasons stated, we uphold the judgment for tortious interference, reject the claim of instructional error, and ratify the punitive damage award.

*Affirmed.*

**12.** In her brief, the plaintiff has asked for attorneys' fees referable to this appeal. Under our practice, however, a party seeking a fee award must do so by separate motion, filed within thirty days of the date of this court's final judgment. *See* 1st Cir. R. 39.2. We take no view at this time as to the plaintiff's entitlement to such an award.