CARLOS MADARIAGA'S (dependent's) CASE.

Suffolk. January 7, 1985. — March 15, 1985.

Present: ARMSTRONG, CUTTER, & FINE, JJ.

*Workmen's Compensation Act,* To whom act applies, Amount of compensation.

Evidence in a workmen's compensation case warranted a finding that one who had been hired with his wife to manage a restaurant under an informal arrangement with the restaurant's owner was an employee of the restaurant rather than an independent contractor. [478-482]

Where an employee had sustained injuries resulting in brain damage before the effective date of the 1981 amendment of G. L. c. 152, § 36A, which limited recovery for such injuries to $20,000, and where the workmen's compensation insurer had made payments to the employee's widow under G. L. c. 152, §§ 31 and 33, before the final decision on her claim under § 36A, the widow's recovery under § 36A was not limited to $20,000. [482-483]

CERTIFICATION to the Superior Court Department of a decision by the Industrial Accident Board.

The case was heard by *James D. McDaniel, Jr.,* J.

*John E. Coyne* for the insurer.

*Robert M. Schwartz* for the claimant.

CUTTER, J. The decedent Madariaga's widow (the claimant) sought before the Industrial Accident Board (the board) benefits under G. L. c. 152, § 36A, based on injuries incurred by the decedent at work on June 27, 1981, when (during an early morning holdup at the restaurant where he worked) the decedent was shot between the eyes. His brain was severely damaged and he died about twelve hours later at a hospital. The decedent, when admitted to the hospital, "was alive and breathing."

The business of the restaurant, known as Casa Romero, was incorporated as DuFour's, Inc. The insurer promptly accepted the decedent's injury as an industrial accident and has paid

death benefits to the claimant under G. L. c. 152, §§ 31 and 33.[1]

On the application for benefits under § 36A, a single member of the board made extensive findings. On the basis of substantial medical testimony he concluded that, if the decedent had survived, he would have suffered disfigurement and losses of function entitling him to compensation of $76,100 in the aggregate under § 36, payable to the claimant under § 36A, amended by St. 1981, c. 572, § 4.[2] The single member, after reviewing the evidence presented to him, also found that, in the circumstances stated below, the decedent was an employee of DuFour's, Inc., and was not an independent contractor.

The insurer was directed to pay $76,100 to the claimant and also to meet various fees and expenses. The reviewing board adopted the findings and decision of the single member. On complaint to the Superior Court by the claimant that the insurer refused to make payment pursuant to the board's order, a Superior Court judge ordered judgment affirming the reviewing board's decision. From this judgment the insurer has appealed. We affirm.

1. The insurer contends that the evidence does not support the single member's conclusion that the decedent at his death

---

[1] An agreement was made on October 19, 1981, between the claimant and the insurer under which (pursuant to G. L. c. 152, § 31) the claimant was to receive compensation of $110 each week and was stated to have been paid $1,760 as a first payment. The single member found that the insurer has continued to make these weekly payments.

[2] The 1981 amendment of § 36A added a paragraph which reads: "Where any specified loss . . . under section thirty-six is a result of an injury involving brain damage, then, to that extent, payment in total under this section for such specific loss or losses resulting from said brain damage only shall be in the amount of twenty thousand dollars. In no event shall payments be made under this section for an injury resulting in instantaneous death." Section 5 of c. 572, provided that the chapter should take effect on its passage (approved November 24, 1981, followed by an emergency letter on December 1, 1981) "and shall apply only to injuries occurring on and after its effective date." This provision should be considered with c. 152, § 51A, inserted by St. 1969, c. 833, § 1, which reads: *"In any claim in which no compensation has been paid prior to the final decision on such claim,* said final decision shall take into consideration the compensation provided by statute on the date of the decision, rather than the date of the injury" (emphasis supplied).

was an employee of DuFour's, Inc. We summarize the evidence on that issue.

The claimant (Laura Madariaga, formerly Laura Walker) came to the United States from Chile in 1973. In 1974, she was employed at the Casa Romero Restaurant. She was not then (and, by the time of the hearing before the single member, had not become) a citizen of the United States but was a resident alien. She married the decedent on September 5, 1979. He began to work at the restaurant in October, 1980. By then she was manager of the kitchen and he became manager of the dining room with some other duties.

Leo Romero was president and the sole director of DuFour's, Inc., which ran the restaurant as its only business. He owned ninety-four percent of the corporation's stock and, until late 1980, he had been active in the day-to-day management of the restaurant. In late 1980, he began to spend time in Vermont developing property there. To finance his Vermont project, he had sold, earlier in 1980, premises on Gloucester Street, Boston, including the parcel on which the restaurant stood, "retaining . . . a long term lease" of the restaurant.

The single member found that Romero, in the autumn of 1980, asked the claimant to manage Casa Romero for him. The decedent, her husband, "was also hired as a manager . . . with her . . . . The parties . . . agreed to . . . arrangements concerning duties, accounts payable, accounts receivable . . . and bookkeeping procedures" under which "the claimant and the deceased were . . . to deposit $9,000 . . . per month in the DuFour's checking account and DuFour's would continue to pay the [restaurant's] major overhead expenses . . . including . . . rent, general liability and [w]orker's [c]ompensation [i]nsurance, utilities, equipment, repairs, liquor license renewal fees, personal property taxes, replacement of major equipment and maintenance of other equipment. The . . . [decedent] and the claimant were to pay most of the every day operating expenses such as meals and payroll taxes, candles, flowers, rubbish removal, and cleaning . . . office supplies, telephone, advertising, dining room supplies, kitchen and bar supplies

. . . and the employee payroll, including weekly salaries to [the] claimant and the" decedent.[3]

On his subsidiary findings, the single member concluded that the decedent was an employee of DuFour's, Inc., and was not an independent contractor. As the single member pointed out, the decedent "was selling his services under a business arrangement with the owner of the restaurant" and "did not even have the authority to change the menu without . . . Romero's permission."

The subsidiary findings had support in not wholly consistent testimony of the claimant and Romero about the arrangements between (a) Romero and (b) the claimant and the decedent.[4]

Although some of the arrangements may have been written, no writing appears to have been relied on as stating with precision what the parties intended. Romero, the claimant, and the

---

[3] The single member also found that the funds to pay expenses were to come from the DuFour's overhead bank account and the restaurant's other accounts. "Any monies left over after payment of the expenses and the payroll were to be . . . incentive pay or bonuses to the claimant and the [decedent] . . . . Romero could terminate at will the business arrangement . . . and not be subject to liability. Although both the [decedent] and the claimant had been given [by Romero] wide discretion in the day-to-day performance of . . . duties [Romero] had authority to make major decisions concerning major equipment replacement, redecorating . . . changing of menus and prices . . . . Romero would visit the restaurant at least once a month to check on its management by the claimant and the" decedent.

[4] Some testimony was not the subject of specific findings by the single member. That testimony, however, could reasonably have been viewed by the single member as generally consistent with his conclusions. Among matters of testimony, not the subject of findings, were (a) that, at the beginning of the arrangement with Romero, the claimant and her husband purchased (for $5,594) DuFour's, Inc.'s, inventory of food and liquor, which DuFour's, Inc., repurchased (for $5,768) at the end of the arrangement; (b) that, because the claimant and the decedent were not citizens of the United States, the liquor license of this Boston restaurant had to be in the name of a citizen, one Allison, who accompanied Romero on his visits to the restaurant; and (c) that the operating expenses were a responsibility of the claimant and the decedent (so that any loss in day-to-day operations would have been borne by them). The testimony of Romero strongly suggests, however, that it was contemplated there would be some operating surplus which would provide an incentive bonus to the claimant and the decedent, and so it apparently turned out to be.

decedent all appear to have accepted (a) the operating methods actually employed and (b) that Romero retained the ultimate power to control the operations. The arrangement may have been somewhat unusual and, as Romero testified, it was "a very trusting relationship . . . basically done on a handshake." Despite its informality and some possible ambiguity in detail, reading the evidence about the arrangement affords persuasive support to the findings and conclusions of the single member.

The board's determination whether a person is an employee within G. L. c. 152, § 1(4), as appearing in St. 1945, c. 369, "under any contract of hire, express or implied, oral or written," is essentially a question of fact for the board, not to be set aside if it is justified by the evidence, unless, of course, it is tainted by some error of law. No such error appears here. See *McDermott's Case,* 283 Mass. 74, 75-77 (1933); *O'Hara's Case,* 310 Mass. 223, 225-227 (1941, worker's compensation insurance against injuries some evidence of employment); *Brigham's Case,* 348 Mass. 140, 141-142 (1964); Locke, Workmen's Compensation, §§ 141-149 (2d ed. 1981). See also *Bell* v. *Sawyer,* 313 Mass. 250, 251-252 (1943); *Enga* v. *Sparks,* 315 Mass. 120, 122-123 (1943, where there is consideration of significance of the circumstance that the worker is furnished equipment by his alleged employer); *Cowan* v. *Eastern Racing Assn.,* 330 Mass. 135, 143 (1953, importance of right of discharge discussed); *Lane's (dependent's) Case,* 354 Mass. 776 (1968). Compare *O'Malley's Case,* 361 Mass. 504, 506-507 (1972). The testimony of Romero that he could terminate the arrangement at any time simply by "coming back to Boston and taking over the active operation" of the restaurant was strong evidence that DuFour's, Inc., had ultimate control over the claimant and the decedent.[5] The conclusion of the

---

[5] The testimony, that the arrangement was originally expected to be a brief one, because of plans of the claimant and the decedent to return to Chile after a short period, also may have given support to the single member's conclusion, as did evidence that DuFour's, Inc., furnished them with W-2 forms for income tax purposes.

single member that the decedent indeed was an employee[6] was well warranted.

2. The insurer contends that the claimant is precluded from recovery to the extent allowed by the Superior Court judgment by the combined effect of G. L. c. 152, § 36A (as amended by St. 1981, c. 572, §§ 4 and 5) and § 51A, inserted by St. 1969, c. 833, § 1. See note 2, *supra*. The 1981 amendment of § 36A was not effective until after June 27, 1981, when the decedent was shot. Thus the $20,000 limitation on recovery for specific losses from brain injury would not be applicable to the claimant's effort to recover specific compensation under § 36A, unless that effort is subject also to § 51A.

In *McLeod's Case,* 389 Mass. 431 (1983), the Supreme Judicial Court dealt with a case where workers' compensation benefits had increased between the date of McLeod's injury and the date of final decision on his claim, and where (at 433 n.2) it was not disputed that "no compensation . . . [had been] paid prior to the Superior Court decision" in that case. The court (at 433-435) held, on those facts, that the board and the courts were required by § 51A to compute compensation at the rates in effect on the date of final decision. In the present case, the claimant, as the decedent's widow, had been receiving from the insurer weekly payments. We regard that fact as sufficient to make § 51A inapplicable by its terms to the claimant's effort to recover specific benefits under § 36A.[7]

---

[6] Since we decide that the evidence provided support for the board's conclusion (that the decedent was an employee of DuFour's, Inc.), there is no occasion for us to consider the claimant's contention that the insurer's agreement to pay weekly compensation to the claimant is binding upon it and estops it now to contend that the decedent was an independent contractor. See *Kareske's Case,* 250 Mass. 220, 224-226 (1924); *Hansen's Case,* 350 Mass. 178 (1966). See also *Corbosiero's Case,* 11 Mass. App. Ct. 590, 592-593 (1981); Locke, Workmen's Compensation §§ 417-418 (1981 & Supp. 1984).

[7] We recognize that the present insurer had disputed its liability to pay the claimant specific benefits under §§ 36 and 36A, from the time such benefits were sought by the claimant although it had paid (and continued to pay) weekly compensation probably important to the claimant. The inclusion in c. 152, § 51A, of the words, "In any claim in which no compensation has been paid prior to the final decision on such claim," may have been in part

The Supreme Judicial Court did not have before it, in *McLeod's Case,* a case where compensation rates or benefits had been reduced or limited between the date of injury and the date of final decision. The court (at 435) specifically pointed out that "§ 51A reflects a legislative intent to avoid obsolescence of compensation rates by requiring benefits to be computed in accordance with the statutory rate in effect at the time of the final decision, when no payments have been made during the period the claim has been contested." We regard this statement as indication that the court (because of the facts with which it then was dealing) interpreted § 51A in the light of the general upward trend of compensation benefits and rates over the years.[8] The Supreme Judicial Court has not yet decided whether it would reach the same result in a case involving less benefits at final decision than on the date of injury. There would be substantial basis for deciding that the Legislature did not intend that § 51A should have any application where benefits were reduced between injury and final decision. See the last two sentences of note 6, *supra,* and the discussion in Locke, Workmen's Compensation § 30, at 39-40. Because, however, weekly compensation has been paid by the insurer before final decision, we need not reach that issue.

*Judgment affirmed.*

a legislative effort to encourage insurers to make a prompt determination and payment of undisputed compensation to claimants likely to be facing fiscal problems. We perceive no legislative intention in the words from § 51A just quoted to make any separation of "compensation" based upon the section of c. 152 under which particular compensation was paid.

[8] The general upward trend of compensation benefits is discussed in Locke, Workmen's Compensation §§ 302, 461 (1981 & Supp. 1984). See also discussions of the *McLeod* case in that textbook's 1984 supplement at §§ 302, n.18; 441, n.4; 591, n.1; 601, n.16.5.