MacLeod-Mancuso, Bonnie H., J.
The plaintiff and defendant in counterclaim, Endodontic Associates of Lexington, Inc. (“EAL”) brought claims against the defendants, plaintiffs in counterclaim and third-party plaintiffs, Joyce C. Johnston-Neeser (“Dr. Neeser”), Kelly Barnes (“Dr. Barnes”), and Sudbury Endodontics, P.C. (“SE”) (collectively the “plaintiffs in counterclaim”), alleging that the plaintiffs in counterclaim had violated non-compete agreements and taken EAL property. Subsequently, the plaintiffs in counterclaim brought counterclaims against EAL, including: Counts I and II: Breach of Contract; Counts III and IV: Breach of the Implied Covenant of Good Faith and Fair Dealing; Counts V and VI: Fraud; Counts VII and VIII: Intentional Infliction of Emotional Distress; Counts IX, X, and XI: Slander; Counts XII, XIII, and XIV: Intentional Interference with Business; Counts XV, XVI, and XVII: Violation of G.L.c. 93A; Counts XVIII, XIX, and XX: Violation of Sherman Anti-Trust Act; Counts XXI, XXII, and XXIII: Violation of G.L.c. 93, §5; and Count XXIV: Declaratory Judgment. For the reasons stated herein, the Motion of Plaintiff to Dismiss Counterclaims is ALLOWED in part, as to Counts IX-XTV and XVIII-XXIII, and DENIED, in part, as to Counts I-VIII, XV-XVII, and XXIV.

*678
BACKGROUND

At this stage of the litigation, the court treats the allegations of the plaintiffs in counterclaim as true. Dr. Neeser and Dr. Bames met one another during their endodontics residencies at the Boston University School of Dentistry in 1999. The third-party defendant, Dr. Elisa Fulton (“Dr. Fulton”) met Dr. Neeser and Dr. Bames when she was their instructor at Boston University during their residencies. At that time, Dr. Fulton was also the owner of an endodontics practice, EAL. In March 2001, Dr. Fulton offered Dr. Neeser an endodontic position with EAL. In December 2002, Dr. Fulton offered Dr. Bames an endodontic position with EAL.

Dr. Neeser’s Agreement with EAL

Before Dr. Neeser agreed to work at EAL, Dr. Fulton made a series of promises to Dr. Neeser, including that: (1) Dr. Neeser would be compensated at a rate of 50% of production;[2] (2) EAL would pay either health or disability benefits, but not both; (3) Dr. Neeser would only work Saturdays if patients were booked to be treated; and (4) Dr. Neeser would be brought on as a partner. Dr. Neeser was reluctant to move her family unless a partnership with EAL was likely. Dr. Neeser rejected other job offers based on the promises that Dr. Fulton had made. In September 2001, Dr. Neeser started to work at EAL. In January 2002, Dr. Fulton presented Dr. Neeser with a document entitled “Associateship Agreement.” Notably, paragraph 6.3(b) of this agreement provided for ninety days notice if EAL wished to terminate Dr. Neeser. Dr. Neeser balked at signing this agreement because it did not contain any of Dr. Fulton’s aforementioned oral promises. Dr. Neeser also expressed concern regarding the inclusion of a non-compete provision.[3] Dr. Fulton urged Dr. Neeser to sign the agreement despite her reservations because, as she stated, it was only a “standard” agreement, which was required by her lawyers. At this time, Dr. Fulton orally confirmed that her prior oral promises would be kept despite their absence from the written contract. On January 23, 2002, Dr. Neeser signed the written agreement.

Dr. Barnes’s Agreement with EAL

Similarly, Dr. Fulton made a series of promises to Dr. Bames. Dr. Fulton promised that: (1) Dr. Bames would be able to work four days a week; (2) EAL would provide health insurance; (3) EAL would pay Dr. Bames on a straight collection basis; and (4) Dr. Bames would be brought on as a partner. Based on these promises, Dr. Bames rejected two other job offers.
On July 2, 2003, Dr. Bames started working at EAL. In October 2003, Dr. Fulton presented Dr. Barnes with a document entitled “Associateship Agreement.” Dr. Fulton told Dr. Bames that the agreement was “standard” and that Dr. Fulton’s lawyers wanted the document signed. Dr. Bames balked at signing the agreement because it did not mention the four-day work-week, health benefits, or partnership terms. Dr. Bames was also concerned about the inclusion of a non-compete provision. Dr. Fulton assured Dr. Barnes that all of the prior oral promises would be kept. At that time, Dr. Bames declined to sign the agreement.
In January 2004, Dr. Fulton again presented Dr. Barnes with the same “Associateship Agreement.” Dr. Bames again expressed her reservations regarding the missing terms in the contract. Dr. Fulton told Dr. Bames to sign the contract that day. Dr. Bames, believing she would be fired if she did not sign, signed the agreement. Notably, Dr. Barnes’s husband was in law school at the time so Dr. Bames was the sole provider for her family.

Working Environment at EAL and the Opening of SE

The working environment at EAL eventually soured. Dr. Neeser and Dr. Barnes both disapproved of Dr. Fulton’s management of EAL. They believed that Dr. Fulton belittled other staff members without cause. Dr. Neeser also had problems with Dr. Fulton’s husband, Ed De Veau (“Mr. De Veau”), who had assumed responsibility for monitoring insurance payments and payroll for EAL. Dr. Neeser noticed discrepancies between her actual pay and her production. At one point, Mr. De Veau refused to pay Dr. Neeser until the insurance company paid EAL. Thereafter, Mr. De Veau paid Dr. Neeser based on contribution rather than production. Further, on one occasion, Mr. De Veau verbally abused Dr. Neeser in front of the office staff.
In January 2004, Dr. Fulton requested that Dr. Neeser agree to change her payment type to contribution-based rather than production-based. Dr. Fulton emphasized that Dr. Neeser’s services were no longer needed because Dr. Bames was, by that time, under contract. Dr. Neeser signed the revised contract on March 11, 2004. Notably, Dr. Neeser was the sole provider for her family at that time because her husband had recently started his own dental practice.
In April 2004, Dr. Barnes and Dr. Neeser began to discuss their mutual dissatisfaction with the EAL workplace. They decided to open a practice together. In the fall of 2004, Dr. Neeser and Dr. Bames found a commercial space available in Sudbury, which was appropriate for an endodontics practice. They determined that the space was 8.2 miles from the closest point in Lexington. Thereafter, they pursued financing for their potential practice. Dr. Neeser’s and Dr. Barnes’s plans came to the attention of Dr. Fulton, who confronted them. Dr. Barnes informed Dr. Fulton that the two were planning to open an office together.
On September 25, 2004, Drs. Neeser, Bames, and Fulton discussed their future plans. During the meeting, Dr. Fulton informed Dr. Bames and Dr. Neeser that she would not offer them partnership in EAL. Dr. Bames and Dr. Neeser then offered to incorporate their new office as a satellite of EAL. Dr. Fulton rejected this proposal. On September 28, Dr. Fulton served Dr. Bames and Dr. Neeser with letters threatening legal action if they opened the new office at its proposed *679 location in Sudbury. In February 2005, Dr. Barnes and Dr. Neeser purchased the commercial space in Sudbury. On August 15, 2005, SE opened for business.
On March 7, 2005, EAL terminated Dr. Neeser, effective in ninety days. Subsequently, however, on March 15, Dr. Fulton blocked Dr. Neeser’s access to the office computer and ordered the receptionist to stop booking appointments for Dr. Neeser. Upon discovering these actions, Dr. Neeser left the office with her belongings. On March 16, Dr. Fulton sent a letter to Dr. Neeser advising her that EAL considered her departure from the office the previous day to be a “voluntary” termination.
On May 20, 2005, Dr. Barnes expressed to Dr. Fulton her continued dissatisfaction with EAL’s continued refusal to honor their prior oral agreements. Thereafter, Dr. Fulton took the following actions: (1) she reduced Dr. Barnes’s security clearance at EAL; (2) she disallowed Dr. Barnes from using a second operatoiy for patient overflow; and (3) she hired an untrained and inexperienced dental assistant whom she assigned to Dr. Barnes.
On June 20, 2005, a colleague of Dr. Barnes, Dr. David Sullivan, informed Dr. Barnes that Dr. Fulton had told him that Dr. Barnes no longer worked for EAL. On June 30, Dr. Barnes terminated her position with EAL, effective in ninety days. Dr. Barnes continued to work Mondays, Wednesdays, and Fridays. When SE opened, Dr. Barnes worked at SE on Tuesdays and Thursdays.
On September 13, 2005, EAL called one of Dr. Barnes’s patients. EAL informed the patient that Dr. Barnes was no longer affiliated with EAL. EAL then tried to reschedule the patient with Dr. Fulton. The patient refused and later relayed this information to Dr. Barnes. That same day, Dr. Barnes received correspondence from Dr. Fulton, advising Dr. Barnes that her position at EAL had been terminated. At the time of her termination, Dr. Barnes had been treating twelve patients at EAL. Dr. Barnes, concerned that these patients needed continued treatment with an endodontist familiar with their personal conditions, called the patients’ referring dentists and provided her contact information. Three of these patients have contacted Dr. Barnes and requested that she continue their respective treatment.

MOTION TO DISMISS STANDARD

In considering a motion to dismiss, “the allegations of the complaint, as well as such inferences as may be drawn therefrom in the plaintiffs favor, are to be taken as true.” Nader v. Citron, 372 Mass. 96, 98 (1977), citing Balsavich v. Local 170, Int'l Bhd of Teamsters, 371 Mass. 283 (1976) (additional citations omitted). Further, “a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” Nader, 372 Mass. at 98, quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Moreover, “a complaint is sufficient against a motion to dismiss if it appears that the plaintiff may be entitled to any form of relief, even though the particular relief he has demanded and the theoiy on which he seems to rely may not be appropriate.” Nader, 372 Mass. at 98, citing Janke Constr. Co. v. Vulcan Materials Co., 527 F.2d 772 (7th Cir. 1976) (additional citations omitted). Therefore, a plaintiff “must prevail over the motion [to dismiss] unless it appears with certainty that he is entitled to no relief under any combination of facts that could be proved in support of his claims.” Brum v. Town of Dartmouth, 44 Mass.App.Ct. 318, 322 (1998), citing Flattery v. Gregory, 397 Mass. 143, 145-46 (1986) (additional citations omitted). The court is “not to consider the unlikelihood of the plaintiffs ability to produce evidence to support otherwise legally sufficient complaint allegations.” Brum, 44 Mass.App.Ct. at 322, citing Mmoe v. Commonwealth, 393 Mass. 617, 619-20 (1985) (additional citations omitted).

DISCUSSION Counts I and II: Breach of Contract; and Counts II and IV: Breach of the Implied Covenant of Good Faith and Fair Dealing

Dr. Neeser and Dr. Barnes each maintain that EAL breached the terms of their respective contracts and further breached the implied covenant of good faith and fair dealing. EAL counters that these claims depend on alleged oral promises that were not part of Dr. Neeser’s or Dr. Barnes’s written employment agreements, each of which includes an integration clause prohibiting such reliance. See Hogan v. Reimer, 35 Mass.App.Ct. 360, 364 (1993). Extrinsic terms to a contract may be enforced if a written contract does not constitute the complete agreement of the parties. Ryder v. Williams, 29 Mass.App.Ct. 146, 149-50 (1990). Representations by a party that a contract term will not be enforced and that a longstanding agreement will continue, may form the basis of a claim for fraud, which, accordingly, evades application of the parol evidence rule. See McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 711-13 (1990).
Here, Dr. Barnes and Dr. Neeser claim that Dr. Fulton made oral promises to them, on behalf of EAL, prior to the time they signed their respective written agreements with EAL. Dr. Barnes and Dr. Neeser also allege that Dr. Fulton told them that the orally agreed upon terms would be kept despite their absence from the written agreements. Further, Dr. Barnes and Dr. Neeser each maintain that they signed their respective agreement under duress. Although the alleged misrepresentations made by Dr. Fulton and the execution of the written agreements did not occur simultaneously, so long as the misrepresentations were still operative at the time of execution, the written agreements did not constitute the complete agreements between the parties. See id at 712, citing Broomfield v. Kosow, 349 Mass. 749, 758-59 (1965). Accordingly, Dr. Barnes’s and Dr. Neeser’s counterclaims for breach of contract against EAL based on the alleged oral promises of Dr. Fulton may not be dis *680 missed.[4] Similarly, Dr. Barnes’s and Dr. Neeser’s claims that EAL breached the implied covenant of good faith and fair dealing also survive, given the alleged failure of EAL to follow through upon Dr. Fulton’s promises.

Counts V and VI: Fraud

Dr. Barnes and Dr. Neeser maintain that their association with EAL was induced by a fraud perpetrated by EAL’s agent Dr. Fulton. In order to demonstrate fraud, a party must establish: (1) that the defendant made a false representation of fact; (2) with knowledge of its falsity; (3) with the purpose of inducing the other party to act; (4) to the other party’s detriment. See Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982), quoting Barrett Assocs. v. Aronson, 346 Mass. 150, 152 (1963). A claim of fraud must be pled with particularity. Mass.R.Civ.P. 9(b). If EAL induced Dr. Neeser and Dr. Barnes to sign their respective “Associateship Agreement” with EAL by making misrepresentations, then those misrepresentations may form the basis of a common-law claim of fraud. McEvoy Travel Bureau, 408 Mass. at 711.
Here, both Dr. Barnes and Dr. Neeser contend that Dr. Fulton, on behalf of EAL: (1) made oral promises, which are enumerated in detail, to Dr. Barnes and Dr. Neeser; (2) feigned that the oral promises would be kept, despite their absence from the written agreements; (3) advised Dr. Barnes and Dr. Neeser that the contracts were “standard” and required by EAL’s lawyers; (4) induced each of them to sign their respective “Associateship Agreement;” breached the oral agreements to Dr. Barnes’s and Dr. Neeser’s detriment. Accordingly, the plaintiffs in counterclaim have pled with sufficient particularity that EAL committed common-law fraud by intentionally making misrepresentations, which induced Dr. Barnes and Dr. Neeser to sign their respective agreements to their detriment.

Counts VII and VIII: Intentional Infliction of Emotional Distress

The plaintiffs in counterclaim maintain that EAL intentionally inflicted emotional distress upon them. The parties agree that the exclusivity provision of G.L.c. 152, §24 bars common-law actions brought by employees against employers for personal injuries. See Hinchey v. Nynex, 144 F.3d 134, 146 n.7 (1st Cir. 1998). Independent contractors, on the other hand, are not covered by G.L.c. 152. See Madariaga’s Case, 19 Mass.App.Ct. 477, 478-81 (1985). At this stage of the litigation, it is not clear what type of relationship, employees or independent contractors, Dr. Barnes and/or Dr. Neeser enjoyed with EAL.
The plaintiffs in counterclaim have alleged that they worked independently with patients, purchased their own equipment and were paid on a commission basis. These factors tend to support a finding that Dr. Barnes and Dr. Neeser worked at EAL as independent contractors. EAL has alleged facts, which may indicate that Dr. Barnes and Dr. Neeser were employees of EAL, but discovery is needed to further flush out this issue. Following such discovery, a motion for summary judgment may be appropriate; however, this Court does not make such judgments at this stage of the litigation. Accordingly, Counts VII and VIII, alleging the intentional infliction of emotional distress, survive EAL’s motion to dismiss.

Counts IX, X, and XI: Slander

The plaintiffs in counterclaim maintain that EAL has slandered them. Specifically, the plaintiffs in counterclaim allege “(u]pon information and belief, EAL has been making false statements to dental colleagues and patients about Dr. Neeser, Dr. Barnes’ professional competence and the competence of their newpractice, SE.” The plaintiffs in counterclaim further allege that “(t]hese false statements have held the Defendants/Plaintiffs-in-Counterclaim up to scorn and contempt.”[5]
The parties disagree as to the appropriate pleading standard for claims of defamation in Massachusetts. Massachusetts courts have not explicitly articulated a heightened pleading standard for defamation claims. The Court in Eyal v. Helen Broad Corp., cited approvingly a stricter pleading standard, which, at that time, was applied in federal courts. 411 Mass. 426, 432 n.7 (1991). In the text of Eyal, however, the court also confoundingly cited to the notice pleading standard as the appropriate standard under which to judge the defamation claim at issue and pursuant to a motion to dismiss. Id. at 429, citing Nader v. Citron, 372 Mass. 96, 98 (1977), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957). An earlier decision similarly reflects a more liberal pleading standard, stating that a complainant “need not set out the precise words used by the particular defendants in defaming the plaintiff." White v. Spencer, 5 Mass.App.Ct. 679, 685 (1977), citing Senay v. Meehan, 5 Mass.App.Ct. 854, 855 (1977). Since Eyal, federal courts have interpreted Massachusetts law as applying a stricter pleading standard.[6] See Dorn v. Astra U.S.A., 975 F.Sup. 388, 396 (D.Mass 1997), citing Eyal, 411 Mass. at 432 n.7.
This Court finds that the standard articulated in Eyal, when viewing the opinion as a whole, requires that a complainant plead with some particularity as to the alleged defamatory statements. 411 Mass. 426. Interpreting Eyal in this manner gives the entire opinion meaning and also lends it the benefit of consistency. The court in Eyal, albeit indirectly, manifestly adopted a heightened pleading standard for the “disfavored claim” of defamation. See Andresen v. Diorio, 349 F.3d 8, 16-17 (1st Cir. 2003), citing Eyal, 411 Mass. at 432 n.7. In footnote seven of the Eyal Court’s opinion, the Court cited the disfavored status of defamation claims and a number of federal cases that had articulated a stricter pleading standard, which required some specificity as to the actual statements at issue. Eyal 411 Mass. at 432 n.7, and cases cited. The Eyal Court then went on to say that in the case before it, “the alleged defamatoiy statement is set out verbatim and publication and extrinsic facts are stated with *681 particularity” and “[a]s a result the plaintiffs amended complaint is to be analyzed under the traditional standard governing Rule 12(b)(6) motions . . .” Id. (Emphasis added.) The usage of the phrase “as a result” can only have meaning if the specificity requirement referenced in the cited federal cases was also applicable under Massachusetts law. Id.
The plaintiffs in counterclaim’s conclusoiy allegations fall short of meeting this heightened pleading requirement. See Dorn, 975 F.Sup. at 396 (applying Massachusetts law, requiring a complainant to plead “with the precise wording of at least one sentence of the alleged defamatory statement(s)”). The plaintiffs in counterclaim have not pled with any specificity as to the contents of the alleged defamatoiy statements or the identity of the individuals who allegedly heard those statements. The conclusoiy allegation that EAL made false statements to others that damaged the plaintiffs in counterclaim is not sufficient to survive a motion to dismiss. Accordingly, the plaintiffs in counterclaim’s allegations of slander against EAL must fail as a matter of law.

Counts XII, XIII, and XIV: Intentional Interference with Business Relationship

The plaintiffs in counterclaim maintain that the allegedly slanderous comments made by Dr. Fulton, on behalf of EAL, and the alleged anti-trust violations constituted intentional interference with a business relationship. As noted above, however, the plaintiffs in counterclaim have failed to plead with sufficient particularity as to the slanderous statements. Further, as discussed below, Counts XVIII-XXIII, which allege that EAL has violated both federal and state anti-trust laws, must fail as a matter of law. Accordingly, because the underlying acts have not survived, the plaintiffs in counterclaim’s allegations of intentional interference with business relations must also fail.

Counts XV, XVI, and XVI1: Violation ofG.L.c. 93A

The plaintiffs in counterclaim maintain that EAL violated G.L.c. 93A. EAL counters that Dr. Neeser and Dr. Barnes may not bring such claims as they were employees of EAL. See Manning v. Zuckerman, 388 Mass. 8, 11-15 (1983). As noted above, however, it is unclear what status Dr. Barnes and/or Dr. Neeser enjoyed with EAL, independent contractors or employees. As independent contractors, Dr. Barnes and Dr. Neeser could bring a claim pursuant to G.L.c. 93A. See id. at 11; See also Schinkel v. Maxi-Holding, Inc., 30 Mass.App.Ct. 41, 49 (1991) (reversing allowance of motion to dismiss claim that defendant violated G.L.c. 93A, in part, because plaintiff could have been an “independent consultant” rather than an employee). A determination of Dr. Barnes’s and Dr. Neeser’s status is best made following discoveiy, after each party has submitted all available evidence as to whether the agreement was “principally private in nature,” such as an employment agreement, or a “marketplace transaction,” such as an agreement to independently contract services. Schinkel 30 Mass.App.Ct. at 49, quoting Manning, 388 Mass. at 14, in turn quoting Lantner v. Carson, 374 Mass. 606, 608 (1978).[7] Accordingly, Counts XXI and XXII, in which Dr. Barnes and Dr. Neeser are the complainants, are not dismissed as the status of Dr. Barnes and Dr. Neeser is yet to be determined.[8]

Counts XVm, XIX, and XX: Sherman Anti-Trust Act

The plaintiffs in counterclaim maintain that EAL has violated 15 U.S.C. §15, a provision of the Sherman Anti-Trust Act. As noted by EAL, Massachusetts state courts do “not have jurisdiction over the cause of action under the Anti-Trust laws.” See Freeman v. Bee Mach. Co, Inc., 319 U.S. 448, 451 n.6 (1943), citing 15 U.S.C. §15. The plaintiffs in counterclaim do not argue the point. Accordingly, the counterclaims alleging violation of the Sherman Anti-Trust Act must be dismissed.

Counts XXI, XXII, and XXIII: Violation of G.L.c. 93, §5

The plaintiffs in counterclaim allege that EAL’s attempt to enforce the non-compete provision of Dr. Barnes’s and Dr. Neeser’s written agreements and EAL’s claim that the plaintiffs in counterclaim procured proprietary information constituted violations of G.L.c. 93, §5, which prohibits “the attempt to monopolize . . . any part of trade or commerce in the Commonwealth.” Federal courts have interpreted “monopoly power” to mean “the power or ability to fix prices or to exclude competition in the relevant market.” Keco Indus., Inc. v. Borg-Warner Corp., 334 F.Sup. 1240, 1245 (1971), citing U.S. v. Grinnell Corp., 384 U.S. 563 (1966) (interpreting Section Two of the Sherman Act, a comparable federal counterpart to G.L.c. 93, §5).[9] In order to prove a claim for “attempted monopolization” the complainant must demonstrate: (1) the “dangerous probability” that amonopoly exists; (2) that “overt acts” have been committed in a monopoly’s furtherance; (3) with the “specific intent” to achieve monopoly power. Keco Indus., Inc., 334 F.Sup. at 1245, citing Lorain Journal Co. v. United States, 342 U.S. 143 (1951), Buckeye Powder Co. v. E.I. DuPont de Nemours Powder Co., 248 U.S. 55 (1918), and Times-Picayune Publishers Co. v. United States, 345 U.S. 594 (1953). Non-compete agreements are generally enforceable in Massachusetts, so long as, they are reasonable. See Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 289 (1974); Wells v. Wells, 9 Mass.App.Ct. 321, 323 (1980), and cases cited. The assertion of trade secret claims in bad faith, in an attempt to monopolize the marketplace, may “constitute a cause of action under the anti-trust laws, provided that the other essential elements of a violation are proven.” CVD, Inc. v. Raytheon, 769 F.2d 842, 851 (1st Cir. 1985).
Previously, EAL moved for a preliminary injunction, seeking to enforce the non-compete provisions and the provisions prohibiting the procurement of proprietaiy information contained in each of Dr. Neeser’s and Dr. Barnes’s agreements. EAL’s Motion for Preliminaiy Injunction was denied. The plaintiffs in counterclaim contend that the denial of EAL’s Motion for Preliminary *682 Injunction constituted a dispositive determination that EAL’s attempt to enforce the aforementioned provisions is in bad faith. The standard for a preliminary injunction is markedly different than the standard which will be used at trial to adjudicate EAL’s claims. In fact, the memorandum of decision of this court (Sanders, J.) denying the preliminary injunction cited an issue in dispute, the distance of SE’s location to Lexington.[10] A preliminary injunction may have constituted an unduly harsh remedy for what was, at worst, a slight violation of the non-compete agreement, particularly in consideration of such a drastic remedy’s harmful effects on the plaintiffs in counterclaim. The denial of EAL’s motion for a preliminary injunction, however, does not preclude a jury from awarding EAL damages or injunctive relief following a trial.
While the plaintiffs in counterclaim have alleged that EAL owns a market share of the endodontics market in a particular geographic region, they have not alleged that a “dangerous probability” exists that EAL enjoys a monopoly in this market area. Further, although EAL is attempting to block the plaintiffs in counterclaim from operating within its market area, no allegation has been put forth that EAL can fix prices within the field of endodontics or generally exclude competition from this region. The court’s memorandum of decision denying the preliminary injunction noted that “no trade secrets or confidential information [was] at stake” as the list of dentists contacted by the plaintiffs in counterclaim was public information. As noted above, a bad faith attempt to enforce “trade secrets” may give rise to anti-trust law claims. See CVD, Inc., 769 F.2d at 851. Notwithstanding this fact, the plaintiffs in counterclaim’s allegations of attempted monopolization must include an allegation that a “dangerous probability” exists that EAL enjoys a monopoly of the practice of endodontics in the relevant market area. See id.; see also Keco Indus., Inc., 334 F.Sup. at 1245, and cases cited. An allegation that EAL enjoys a mere market share is not sufficient to bring a claim under G.L.c. 93, §5. Accordingly, Counts XXI, XXII, and XXIII do not survive EAL’s motion to dismiss as the plaintiffs in counterclaim have not alleged the “dangerous possibility” that EAL enjoys a monopoly in the relevant market area.

Count XXIV: Declaratory Relief

The plaintiffs in counterclaim also seek a declaratory judgment “invalidating the [written] contracts [signed with EAL], holding them unenforceable as a matter of law.” Generally, when a complaint seeks a declaratory judgment and a court has jurisdiction over the matter, a court should declare the rights of the parties. MacEachem v. City of Boston, 9 Mass.App.Ct. 907, 908 (1980), citing Hannan v. Enter. Publ’g Co., 341 Mass. 363, 365 (1960) (additional citations omitted). As the plaintiffs in counterclaim have presented a justiciable dispute regarding the validity of their contracts with EAL, their claim seeking declaratory relief should not be dismissed.

ORDER

For the foregoing reasons, after careful consideration of the parties’ written and oral submissions, the Motion of Plaintiff to Dismiss Counterclaims is ALLOWED, in part, as to Counts EX-XIV and XVIII-XXOI, and DENIED, in part, as to Counts I-VIII, XV-XVII, and XXIV.

 According to the parties, compensation on a production basis is calculated based on a percentage of the billed services provided to patients without consideration of the actual payments received, from insurance companies or patients. Compensation on a contribution basis, on the other hand, is calculated based on a percentage of the actual payments received from insurance companies and patients.

 The non-compete provision in both Dr. Barnes’s and Dr. Neeser’s agreements prohibited them from opening an Endodontics practice within three years of leaving EAL at a location within eight miles of Lexington, Massachusetts.

 The counterclaims alleging non-payment for services and loss of income also survive. EAL has not opposed these counterclaims substantively and the survival of the plaintiffs in counterclaim’s other counterclaims bring these claims within the Court’s jurisdiction.

 In the plaintiffs in counterclaim’s opposition to EAL’s motion to dismiss, they assert that “Dr. Fulton, on behalf of EAL has been telling several influential referring dentists that Dr. Barnes and Dr. Neeser have ‘nailed’ EAL to the ‘wall’ and have stolen patients in opening their practice.” Notably, this more specific assertion does not appear in the plaintiffs in counterclaim’s verified counterclaim. This Court does not consider assertions made in a supporting memorandum as part of the plaintiffs in counterclaim’s allegations.

 The plaintiffs in counterclaim assert that Dorn has since been overruled, citing Bleau v. Greater Lynn Mental Health & Retardation Ass’n., 371 F.Sup.2d 1, 2 (D.Mass. 2005). The Court in Bleau, however, dealt exclusively with federal pleading standards for defamation claims. Id. at 4. In fact, the Court in Bleau explicitly stated “that Dorris discussion of Massachusetts’ pleading requirements in defamation cases is still correct.” Id. at 3.

 Additionally, the plaintiffs in counterclaim have alleged that EAL slandered and interfered with their business relations after their association with EAL had ended. As noted above, the plaintiffs in counterclaim’s slander claims and interference claims do not survive EAL’s motion to dismiss. Accordingly, claims relying on EAL’s conduct after Dr. Barnes and Dr. Neeser left EAL must fail. Similarly, the plaintiffs in counterclaim have not pled facts from which a jury could find that EAL slandered SE or intentionally interfered with SE.

 In Count XXIII, SE is the complainant alleging that EAL violated G.L.c. 93A. EAL has not challenged this Count. Accordingly, Count XXIII similarly survives EAL’s motion to dismiss.

 Section One of G.L.c. 93 states, in part, that “[t]his chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable.” Accordingly, this Court affords equal weight to the federal interpretation of comparable federal anti-trust laws unless impracticable.

 The court stated that “[ejven according to plaintiffs evidence, the defendants’ new office is 7.75 [miles] away from the nearest point in Lexington, just one quarter of a mile closer than the minimum of eight miles set by the covenant in the employment contract.”